ITT DIVERSIFIED CREDIT CORP.,
Plaintiff-Appellee,

v.

Donald E. COUCH, Treasurer, Jefferson County, State of Colorado, and Board of County Commissioners for the County of Jefferson, Alan Charnes, Executive Director, Department of Revenue, State of Colorado, and The Department of Revenue, State of Colorado, Defendants-Appellees,

v.

RINK–A–DINKS, INC., Lee Reichardt, Inc., and Lee Reichardt, individually, Intervenors-Appellants,

v.

Y–W, LTD., a Colorado Corp., Intervenor,

v.

Robert H. SUMMERS, individually, Intervenor.

No. 81SA322.

Supreme Court of Colorado, En Banc.

Sept. 6, 1983.

Rehearing Denied Oct. 11, 1983.

1356

J.D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., Billy Shuman, Asst. Sol. Gen., Denver, for Alan Charnes & Dept. of Revenue, defendants-appellees.

Patrick R. Mahan, County Atty., Richard F. Mutzebaugh, Asst. County Atty., Denver, for Donald E. Couch and Bd. of County Commissioners, defendants-appellees.

Shoemaker, Wham, Krisor & Bendelow, Susan E. Burch, Edward M. Bendelow, Denver, for intervenors-appellants.

NEIGHBORS, Justice.

The intervenors-appellants (intervenors) appeal the decision of the district court that

tax liens upon the goods and business fixtures of a taxpayer asserted by the State of Colorado and other governmental entities for delinquent sales and withholding taxes take priority over the intervenors' security interest in the property.[1] The intervenors urge three grounds for reversal: (1) The trial court failed to make adequate findings of fact and conclusions of law as required by C.R.C.P. 52(a). (2) The trial court erred in holding that the tax liens are prior to the intervenors' perfected security interest in the delinquent taxpayer's property. (3) The decision of the trial court subjects the intervenors to unequal treatment under the Fourteenth Amendment to the United States Constitution. We affirm the judgment of the trial court.

### I.

On December 18, 1978, TNT Motorcycles, Inc. (TNT) entered into an agreement to purchase a motorcycle business from Rink-A-Dinks, Inc. (Rink-A-Dinks), one of the intervenors. The business was sold to TNT in January of 1979, pursuant to the terms of the purchase agreement. As part of the purchase price, TNT executed two promissory notes payable to Rink-A-Dinks in the respective amounts of $50,000 and $20,000. The notes were secured by a financing statement covering

"[a]ll leases, franchises, equipment, furniture, inventory, tools, name and good will, customer lists, and all other assets comprising, enabling, or used in or in connection with the business of retail sales and repairs of new and used go-carts, motorcycles, motorbikes and snowmobiles operated at 1595 Carr Street, Lakewood, Colorado."

The financing statement was filed with the Colorado Secretary of State.

On January 22, 1979, TNT borrowed funds from ITT Diversified Credit Corporation (ITT) and executed a security agreement and financing statement giving ITT a security interest in TNT's inventory of goods. The financing statement provided that the following property was covered:

"All inventory of goods, whenever acquired and wherever located, including, without limitation, commercial, vehicular, recreational, household, professional, industrial, musical or farm goods and all parts, accessories and other goods used or intended to be used in connection with any of the foregoing, now owned or hereafter acquired; wherever located."

When TNT failed to make the required payments, ITT, under the terms of its security agreement, repossessed some of TNT's inventory on November 7 or 9, 1979. Thereafter, on November 16, 1979, Rink-A-Dinks repossessed TNT's remaining equipment and inventory. Approximately ninety percent of the property repossessed by Rink-A-Dinks was comprised of inventory and parts for motorcycles. Ten percent of the property was in the form of equipment and business fixtures.

When the Colorado Department of Revenue (Department) did not receive tax returns from TNT in the late months of 1979, the Department computed an estimate of TNT's tax delinquencies pursuant to section 39–26–118(2)(a) and (b), C.R.S.1973. A ten-day delinquency notice was sent to TNT, which failed to respond. Accordingly, three distraint warrants were issued by the Department against TNT in November and

1. The tax liens are for delinquent sales taxes due the State of Colorado, Jefferson County, the City of Lakewood, and the Regional Transportation District for the period from August through October 1979, and for delinquent withholding taxes owed to the State of Colorado from July through December 1979. Under sections 29–2–106(1) and 32–9–119(2)(a), C.R.S. 1973 (1977 Repl.Vol. 12 & original Vol. 13, respectively), the collection, administration,

and enforcement of the sales taxes imposed by the various governmental entities are performed in the same manner as the state sales tax, which is governed generally by article 26 of title 39, C.R.S.1973 (1982 Rep.Vol. 16B). Since there is no issue restricted to one particular sales tax claimed by any of the governmental entities, we will treat the sales tax issues generically.

December of 1979. The warrants authorized the levy and seizure of all merchandise and fixtures located at TNT's place of business. The distraint warrants were served on the deputy treasurer for Jefferson County on December 27, 1979. The treasurer was designated by the Department as its agent to collect the delinquent taxes owed to the State of Colorado by TNT.

After receiving two "bad checks" from TNT (the checks were stamped "account closed"), Jefferson County issued its own distraint warrant on December 26, 1979, to enforce the payment of personal property taxes due for that year. All of TNT's property, including the goods which had been repossessed by ITT and the intervenors, was seized pursuant to the warrants. Later, on March 10, 1980, additional motorcycles were seized by Jefferson County by virtue of a second distraint warrant which was issued on that date.

On February 11, 1980, an involuntary bankruptcy petition was filed in the United States Bankruptcy Court for the District of Colorado against TNT by Lee Reichardt, another of the intervenors and the owner of the corporate stock of Rink-A-Dinks. The bankruptcy action triggered an automatic stay order of all proceedings against TNT. The stay was released by the bankruptcy court on April 28, 1980.

This case arose on March 7, 1980, when ITT filed its complaint in replevin seeking to recover the property which had been seized by Jefferson County. After the stay order was vacated by the bankruptcy court and pursuant to a written stipulation of all parties, ITT filed a redelivery bond in the amount of $9,465.47 and obtained possession of the property it had earlier repossessed.

Lee Reichardt filed a similar bond in the sum of $9,298 to secure the release of the property which had been repossessed by Rink-A-Dinks. The Department and its executive director were added as indispensable parties to the case. The intervenors were permitted to intervene to protect their interests in the property.[2]

Following a court trial, the trial judge found in favor of Jefferson County in the amount of $1,424.15 for delinquent property taxes. Judgment was entered in favor of the Department in the amount of $14,343.22 for delinquent sales and withholding taxes. The judgments were entered against ITT and the intervenors. ITT has not appealed from the judgment of the trial court. Nor is the trial court's decision on the property tax issue involved in this appeal.

II.

The intervenors' first argument for reversal is that the trial court's findings of fact and conclusions of law are insufficient under C.R.C.P. 52(a) to support the entry of the judgment against them. The basis for the intervenors' argument is that the trial court made only one finding regarding them and it concerns the release of property when the redelivery bond was posted. No specific findings were entered by the trial court on the allegations made by the intervenors in their various pleadings. Nor did the trial court make specific findings which established the intervenors' liability for the taxes due and owing to the governmental entities. However, in its conclusions of law, the trial court determined that ITT and the intervenors were secured parties who had repossessed the property of the delinquent taxpayer and were, therefore, liable for the

2. In addition to the intervenors-appellants, Robert H. Summers intervened as the owner of the real property located at 1595 Carr Street in Lakewood, where TNT conducted its motorcycle business. Summers took possession of the property on December 20, 1979, when he terminated the lease with Rink-A-Dinks which had been assigned to TNT as part of the purchase agreement. On April 1, 1980, Summers leased the property to Y–W, Ltd., who also intervened to protect its leasehold interest in the premises which had been locked by the Department and which contained the goods and business fixtures that are the subject matter of this case. Neither of these intervenors has appealed because the trial court did not impose any liability for the unpaid taxes upon them.

unpaid sales and withholding taxes. The trial court entered judgment against ITT and the intervenors for the unpaid taxes, including interest. No penalties were awarded to the governmental bodies by the trial court in its final judgment.

■ The intervenors' argument is rejected for two reasons. First, the findings of fact and conclusions of law entered by the trial court and the evidence offered at trial provide an adequate foundation for the entry of judgment against the intervenors. *Uptime Corp. v. Colorado Research Corp.,* 161 Colo. 87, 420 P.2d 232 (1966); *Murray v. Rock,* 147 Colo. 561, 364 P.2d 393 (1961). The well-reasoned decision of the trial court provides us with a clear understanding of the reasons for its ruling. *Twin Lakes Reservoir and Canal Co. v. Bond,* 156 Colo. 433, 399 P.2d 793 (1965); *Bulow v. Ward Terry & Co.,* 155 Colo. 560, 396 P.2d 232 (1964).

■ Second, the intervenors concede in their briefs filed in this court that the facts are undisputed and that the pivotal issues in the case involve questions of law. Indeed, the intervenors urge that the case not be returned to the trial court for entry of further factual findings. We are at a loss to understand why this argument for reversal has been advanced. Since there is no dispute in the evidence and the issues raised by the intervenors are questions of law, we will resolve the case on its merits. *See Mowry v. Jackson,* 140 Colo. 197, 343 P.2d 833 (1959).

## III.

The Jefferson County Treasurer, acting on behalf of Jefferson County and the Department, seized the inventory and business fixtures which had been repossessed from TNT by the intervenors to enforce the sales tax liens. Accordingly, the question to be answered is whether the tax liens take priority over the intervenors' perfected security interest in the goods and business fixtures of the defaulting debtor who failed to pay the requisite taxes.

Section 39–26–117, C.R.S.1973 (1982 Repl. Vol. 16B), provides in pertinent part:

"*Tax lien—exemption from lien.* (1)(a) The tax imposed by this part 1 shall be a first and prior lien upon the goods and business fixtures of or used by any retailer under lease, title retaining contract, or other contract arrangement, excepting stock of goods sold or for sale in the ordinary course of business, and shall take precedence on all such property over other liens or claims of whatsoever kind or nature.

. . . .

"(e) If the purchaser of a business or stock of goods fails to withhold the purchase money as provided in paragraph (d) of this subsection (1), and the taxes are due and unpaid after the ten-day period allowed, he, as well as the vendor, shall be personally liable for the payment of the taxes unpaid by the former owner. Likewise, anyone who takes any stock of goods or business fixtures of or used by any retailer under lease, title retaining contract, or other contract arrangement, by purchase, foreclosure sale, or otherwise, takes same subject to the lien for any delinquent sales taxes owed by such retailer, and shall be liable for the payment of all delinquent sales taxes of such prior owner, not, however, exceeding the value of property so taken or acquired.

"(2) Whenever the business or property of any taxpayer subject to this part 1 shall be placed in receivership, bankruptcy, or assignment for the benefit of creditors, or seized under distraint for property taxes, all taxes, penalties, and interest imposed by this part 1 and for which said retailer is in any way liable under the terms of this part 1, shall be a prior and preferred claim against all the property of said taxpayer, except as to preexisting claims or liens of a bona fide mortgagee, pledgee, judgment creditor, or purchaser whose rights shall have attached prior to the filing of the notice as provided in section 39–26–118 on the property of the

taxpayer, other than the goods, stock in trade, and business fixtures of such taxpayer. No sheriff, receiver, assignee, or other officer shall sell the property of any person subject to this part 1 under process or order of any court, without first ascertaining from the executive director the amount of any taxes due and payable under this part 1, and if there are any such taxes due, owing, or unpaid, it is the duty of such officer to first pay the amount of said taxes out of the proceeds of said sale before making payment of any moneys to any judgment creditor or other claims of whatsoever kind or nature, except the costs of the proceedings and other preexisting claims or liens as provided in this section. For the purposes of this part 1, 'taxpayer' includes 'retailer'."

Section 39–26–117(1)(a) creates a first and prior tax lien upon the "goods and business fixtures" belonging to any retailer. *B.K. Sweeney Electrical Co. v. Poston,* 110 Colo. 139, 132 P.2d 443 (1942); *Young v. Golden State Bank,* 632 P.2d 1053 (Colo. App.1981). The intervenors rely upon the statutory language "excepting stock of goods sold or for sale in the ordinary course of business" found in this section to support their contention that the property they repossessed was not subject to the tax liens. However, section 39–26–117(1)(e) states that "anyone who takes any stock of goods or business fixtures of or used by any retailer ... by purchase, foreclosure sale, or otherwise" takes them "subject to the lien for any delinquent sales taxes owed by such retailer, and shall be liable for the payment of all delinquent sales taxes of such prior owner...." Section 39–26–117(2) provides that when the property of a taxpayer is seized under distraint for property taxes, the lien for sales tax shall be a "prior and preferred" claim against all of the taxpayer's property "except as to preexisting claims or liens of a bona fide mortgagee

... [whose rights have attached on property] other than the goods, stock in trade, and business fixtures of such taxpayer." [3]

### A.

■ In interpreting the statutory scheme governing the collection of delinquent sales taxes, we are guided by several cardinal rules of statutory construction. Before a statute creating a lien in favor of the state for unpaid sales taxes will be construed as giving such a lien priority over a mortgage, security interest, or other contractual lien which was perfected at the time the lien came into existence, the legislative intent that such priority be given must clearly appear from the language of the statute. *Gifford v. Callaway,* 8 Colo. App. 359, 46 P. 626 (1896); *Wilkinson v. Wilkinson,* 51 Cal.App.3d 382, 124 Cal.Rptr. 870 (1975); *Home Owners' Loan Corp. v. Hansen,* 38 Cal.App.2d 748, 102 P.2d 417 (1940); *Malakoff v. Washington,* 434 A.2d 432 (D.C.1981). *See also* Annot., 136 A.L.R. 1015 (1942). Courts have a duty to ascertain the legislative intent and give effect to such intent wherever possible. *U.M. v. District Court,* 631 P.2d 165 (Colo.1981); *Alvarez v. District Court,* 186 Colo. 37, 525 P.2d 1131 (1974); *Bedford v. C.F. & I. Corp.,* 102 Colo. 538, 81 P.2d 752 (1938). Courts must give effect to all statutes governing the same subject. *People in the Interest of M.K.A.,* 182 Colo. 172, 511 P.2d 477 (1973). *See also* sections 2–4–201(1)(b) and (1)(c), C.R.S.1973 (1980 Repl.Vol. 1B); *Howe v. People,* 178 Colo. 248, 496 P.2d 1040 (1972); *Public Utilities Commission v. Stanton Transportation Co.,* 153 Colo. 372, 386 P.2d 590 (1963); *Clark v. Fellin,* 126 Colo. 519, 251 P.2d 940 (1952). Statutes which create tax liens upon property may not be enlarged by judicial construction. *City and County of Denver v. Armstrong,* 105 Colo. 290, 97 P.2d 448 (1939); *Fairbanks North Star Borough v. Howard,* 608 P.2d 32, 34 n.

**3.** We assume without deciding that an Article 9 secured party under the Uniform Commercial Code is a "bona fide mortgagee" within the

meaning of section 39–26–117(2), C.R.S.1973. *See Young v. Golden State Bank,* 632 P.2d 1053 (Colo.App.1981).

8 (Alaska 1980). *See also Kellogg v. Hickman,* 12 Colo. 256, 21 P. 325 (1889).

[7, 8] The application of these legal principles to the facts of this case leads us to the same conclusion reached by the trial court. The exemption from the lien created in section 39–26–117(1)(a) applies only to the taxpayer's "stock of goods sold or for sale in the ordinary course of business." Sections 39–26–117(1)(e) and (2), which impose the tax liability on subsequent owners of the property and the property itself, refer only to "stock of goods," "business fixtures," "goods," or "stock in trade." The qualifying words, "in the ordinary course of business," are not included in these latter sections. This omission signals to us that the exemption created in section 39–26–117(1)(a) protects only the retail customers of the taxpayer who purchased goods from the retailer's inventory in the ordinary course of business. The exception does not apply to persons who obtain the retailer's goods and fixtures by foreclosure, bulk sale of inventory, or repossession. The business transactions here are clearly not "in the ordinary course of business."

■■■ Controversies between a tax lien claimant and the holder of a security interest or a chattel mortgage concerning the respective rights of the parties in the subject property are treated as contests between lien claimants, with the disposition dependent upon the priority of their respective liens. *B.K. Sweeney Electrical Co. v. Poston, supra.* In that case we held that the lien for state sales and service taxes took priority over a chattel mortgage which had previously attached. The matter of establishing tax liens is one for legislative determination. The General Assembly may enact legislation imposing a tax lien upon property and may establish the relative priority of tax liens that are created. *Hodge v. Muscatine County,* 196 U.S. 276, 25 S.Ct. 237, 49 L.Ed. 477 (1905); *People v. City and County of Denver,* 85 Colo. 61, 273 P. 883 (1928); *Smith v. United States,* 113 F.Supp.

702 (D. Hawaii 1953); *Minneapolis Threshing Machine Co. v. Roberts County,* 34 S.D. 498, 149 N.W. 163 (1914).

In accordance with the clear legislative mandate which cannot be circumvented by judicial interpretation, we hold that the liens for state sales taxes are a first and prior lien upon the goods and business fixtures of TNT and have priority over the intervenors' security interest. Our decision is consistent with the holdings announced by courts in other jurisdictions. *See, e.g., State Department of Treasury v. Campbell,* 107 Mich.App. 561, 309 N.W.2d 668, 671 (1981) (state sales tax lien has priority over attorney's charging lien under statute similar to section 39–26–117(1)(a), C.R.S.1973 (1982 Repl.Vol. 16B), but which contained an exception to the priority for "previously recorded bona fide financing"); *Smith v. United States, supra* (general excise tax liens of the Territory of Hawaii take priority over a recorded trust chattel mortgage); and *Malakoff v. Washington, supra* (District of Columbia's lien for unpaid sales and withholding taxes takes priority over a prior perfected security interest).

### B.

■■■ The next argument made by the intervenors is that the liens for sales taxes are inchoate liens which do not attach to personal property until the amount of the taxes due and owing is determined and assessed and then recorded in compliance with section 39–26–118(3)(b), C.R.S.1973 (1982 Repl.Vol. 16B). That statute provides that a notice of delinquency *may* be filed with the county clerk. The statute further provides that

"[a]fter such notice has been filed, or concurrently therewith, or at any time when taxes due are unpaid, whether such notice is filed or not, the executive director may issue a warrant directed to any duly authorized revenue collector . . . commanding him to levy upon, seize, and sell sufficient of the real and personal property . . . as may be provided by law."

This statutory provision provides one method of enforcing the liens for sales taxes. However, recordation of the notice is permissive rather than mandatory. The alternative procedure which was followed in this case, issuance of a distraint warrant, is prescribed by section 39–21–114, C.R.S.1973 (1982 Repl.Vol. 16B). Therefore, the Department may activate its liens by recording the notice of delinquency under section 39–26–118(3)(b), or by the more immediate means of distraint in accordance with section 39–21–114. *See Malakoff v. Washington, supra.*

 The distinction between choate and inchoate liens is not relevant to the resolution of the intervenors' argument in this case. The difference might have significance if the intervenors met the three criteria set forth in section 39–26–118(3)(a) which are designed to protect a member of that class of persons (1) who is a bona fide mortgagee, pledgee, judgment creditor, or purchaser; (2) whose rights have attached prior to the filing of the notice described in section 39–26–118(3)(b); and (3) whose legal or equitable interest is in property *other than* the goods, stock in trade, or business fixtures of the delinquent taxpayer. The intervenors are the holders of a security interest in TNT's property and their interest was perfected before the Department issued the tax delinquency notices and distraint warrants to TNT. The statute creating the lien for delinquent sales taxes was in effect when the intervenors received the security agreements from TNT. The statute granting the lien became part of the security agreements by operation of law. *B.K. Sweeney Electrical Co. v. Poston, supra.* We hold that the legislature has created a statutory priority for tax liens over any interest a third party might have in the goods, stock in trade, and business fixtures of a delinquent taxpayer. Such legislation is within the province of the General Assembly to adopt.

## C.

Next, the intervenors claim that their perfected security interest takes priority over the tax liens under the Uniform Commercial Code, section 4–9–301(4), C.R.S.1973 (1982 Supp.), which provides:

"(4) A person who becomes a lien creditor while a security interest is perfected takes subject to the security interest only to the extent that it secures advances made before he becomes a lien creditor or within forty-five days thereafter or made without knowledge of the lien or pursuant to a commitment entered into without knowledge of the lien."

The intervenors' reliance on this provision of the Uniform Commercial Code is misplaced. Section 4–9–301(4) was adopted to address issues relating to advances made under a perfected security interest and federal tax liens. The 1972 Official Comment states:

"7. Subsection (4) deals with the question whether advances under an existing security interest in collateral, made after rights of lien creditors have attached to that collateral, will take precedence over rights of lien creditors .... In this section, because of the impact of the rule chosen on the question whether the security interest for future advances is 'protected' under Sections 6323(c)(2) and (d) of the Internal Revenue Code as amended by the Federal Tax Lien Act of 1966, the priority of the security interest for future advances over a judgment lien is made absolute for 45 days regardless of knowledge of the secured party concerning the judgment lien. If, however, the advance is made after the 45 days, the advance will not have priority unless it was made or committed without knowledge of the lien obtained by legal proceedings. The importance of the rule chosen for actual conflicts between secured parties making subsequent advances and judgment lien creditors may not be great; but the rule chosen for the first 45 days is important in effectuating the intent of the Federal Tax Lien Act of 1966."

Uniform Commercial Code § 9–301, 3 U.L.A. 338 (1981). The reasons given by

the drafters for the 1972 amendment to the Uniform Commercial Code are as follows:

"New subsection (4) deals with the question of the extent to which advances made under a perfected security interest after the rights of a lien creditor have attached to the collateral will come ahead of the position of the lien creditor. This subsection should be read with Section 9–307(3) (which deals with the same problem in the case of an intervening buyer) and Section 9–312(7) (which deals with the same problem in the case of a secured party), and paragraph (5) of Reasons for Change under Section 9–312.

"In the case of the lien creditors dealt with by this subsection, the rule chosen is crucial to the priority of the security interest for advances over a federal tax lien for 45 days after the tax lien has been filed, as contemplated under section 6323(c)(2) and (d) of the Internal Revenue Code of 1954 as amended by the Federal Tax Lien Act of 1966. The actual importance of the priority rule chosen between a secured party and possible lien creditors during the 45 days is believed to be slight; but the rule chosen is essential to give the secured party the protection against Federal tax liens believed to have been intended by the Federal Tax Lien Act of 1966, the operation of which is made to depend on state law. The rule of state law was not certain before this revision. Accordingly, the priority of the security interest for future advances over the judgment lien has to be absolute for the 45 days, without regard to any knowledge of the secured party that the judgment lien exists. After the 45 days the priority of the security interest depends on the secured party's lack of knowledge of the lien at the time he makes the subsequent advance or commits to do so."

Uniform Commercial Code § 9–301, 3 U.L.A. 336 (1981).

A similar argument based on section 4–9–201, C.R.S.1973, was rejected by the court of appeals in *Young v. Golden State Bank, supra.* The court of appeals stated as follows:

"Nor do we perceive the language of § 4–9–201, C.R.S.1973, or the circumstances surrounding the promulgation in Colorado of the U.C.C. to warrant a conclusion that, by enacting § 4–9–201, the General Assembly intended to limit the first and prior lien provisions of § 39–26–117. *See* § 4–9–201, C.R.S.1973 (Official Comment); *see also* § 4–9–102(2), C.R.S. 1973."

632 P.2d at 1056–57. Finally, section 4–9–102(2), C.R.S.1973, provides that "[t]his article does not apply to statutory liens except as provided in section 4–9–310." The provisions of section 4–9–310, C.R.S.1973, govern the priority of liens which secure claims arising from providing services or materials to enhance the value of property which is the subject of a valid security interest. "The purpose of this section as amended by Colorado is to provide that liens securing claims arising from work intended to enhance or preserve the value of the collateral do not take priority over an earlier perfected security interest unless the statute giving the lien expressly provides otherwise." Colorado Comment to section 4–9–310, C.R. S.1973. Therefore, we conclude that Article 9 of the Uniform Commercial Code is not applicable in this case because of the specific statutory exemption contained in section 4–9–102(2), C.R.S.1973.

## IV.

We now turn to the withholding tax lien issue. The statute which creates a lien for wage withholding taxes is section 39–22–604(7)(a), C.R.S.1973 (1982 Repl.Vol. 16B), and it provides:

"(7)(a) Every employer who deducts and withholds any amounts under the provisions of this section shall hold the same in trust for the state of Colorado for the payment thereof to the department in the manner and at the time provided for in this section, and the state of Colorado and the department shall

have a lien to secure the payment of any amounts withheld and not remitted as provided in this section upon all of the assets of the employer and all property, including stock in trade, business fixtures, and equipment, owned or used by the employer in the conduct of his business, so long as any delinquency continues, which lien shall be prior to any lien of any kind whatsoever, including existing liens for taxes."

The statute gives the State of Colorado a lien upon all of the employer's assets and all property used in the conduct of his business for as long as the delinquency continues.

The intervenors argue that the state's lien on TNT's property for delinquent withholding taxes was defeated when they repossessed the property described in their security agreement. We reject the argument for two reasons. First, in *International Harvester Credit Corp. v. Goodrich,* 350 U.S. 537, 76 S.Ct. 621, 100 L.Ed. 681 (1956), the United States Supreme Court held that a state's statutory lien for highway use taxes was entitled to priority over the security interest in trucks held by the seller who had repossessed and sold them under a conditional sales agreement. *See also Phelps v. United States,* 421 U.S. 330, 95 S.Ct. 1728, 44 L.Ed.2d 201 (1975); *United States v. Second National Bank of North Miami,* 502 F.2d 535 (5th Cir.1974), *cert. denied,* 421 U.S. 912, 95 S.Ct. 1567, 43 L.Ed.2d 777 (1975).

Second, the rationale which supports our decision upholding the priority of sales tax liens applies equally to the lien for withholding taxes. The statute creating the lien for withholding taxes became part of the security agreements when they were signed by TNT. *B.K. Sweeney Electrical Co. v. Poston, supra.*

As noted by the trial court, the Department must refund taxes to the employee if a refund becomes due or apply the taxes withheld as a credit toward the employee's income tax liability. If the employer does not pay the taxes withheld to the Depart-

ment, it is necessary that the state have a lien on the employer's assets to insure that the Department will be paid the monies withheld from the employee's salary. The intervenors could have protected themselves from this liability by requiring TNT to post security with the Department guaranteeing payment of the withholding taxes and thereby obtain a certificate from the Department exempting TNT's property from attachment to satisfy the lien. *See* section 39–22–604(7)(b), C.R.S.1973 (1982 Repl.Vol. 16B).

## V.

The intervenors' final contention is that the construction of the statutory scheme governing sales tax liens adopted by the trial court deprives them of equal protection of the law under the Fourteenth Amendment to the United States Constitution. The intervenors claim that the trial court's interpretation of the statute denying them the exemption contained in section 39–26–117(1)(a) creates a class, persons who repossess property under a security agreement, that was not explicitly adopted by the legislature. The intervenors urge that there is no rational basis to uphold the classification which results in the imposition of liability for delinquent sales taxes on those who repossess property in which they have a security interest.

We reject the notion that two classes of persons are created by the construction adopted by the trial court and which we approve. A person who becomes the owner of the "goods, stock in trade and business fixtures," which belonged to a delinquent taxpayer, by payment of consideration, foreclosure, repossession, or otherwise, is liable for the payment of delinquent sales taxes and the property so acquired is subject to the sales tax lien. Therefore, since separate classes of persons are not created, the equal protection clause of the fourteenth amendment is not implicated.

## VI.

The statutes creating liens for delinquent sales and withholding taxes clearly

provide that the liens are entitled to priority over any security interest such as that claimed by the intervenors in this case. To limit the priority of the tax liens to only that period when the goods are in the delinquent taxpayer's control by permitting the priority to be terminated upon repossession of the goods by a secured party would defeat the public policy and legislative intent behind tax lien priority statutes. In *B.K. Sweeney Electrical Co. v. Poston, supra,* we stated:

> "A retailer who collects such tax by virtue of the last mentioned sections is a trustee and answerable to the state for such moneys until they are paid over to the state treasurer. See, *Wade v. State,* 97 Colo. 52, 47 P. (2d) 412. The state is not obligated to resort to the ordinary processes available for the collection of private debts to enforce its claims against defaulting collectors of taxes but may proceed in a summary way, as by warrant of distress. *Murray v. Hoboken Land Co.,* 18 How. 272 (U.S.), 15 L.Ed. 372. Since the funds in the hands of the retailer still remain tax money due the state, we discern no valid reason why the power of the legislature to impose a lien on the collector's property should be different or less than its authority to so legislate as against the taxpayer himself."

110 Colo. at 147, 132 P.2d 443.

 In addition to the concept that the collector of sales taxes holds them as a trustee, public policy favors authorizing the state to enforce its right to collect taxes due and owing to it by enacting statutes giving liens priority. "It is essential, in order that the state may collect its revenue and carry on the public business, to make such tax a paramount lien; and, in justice to property owners and taxpayers generally, such tax ought to be a paramount lien, and the same ought to be enforced." *Minneapolis Threshing Machine Co. v. Roberts County,* 34 S.D. at 501, 149 N.W. 163.

The judgment of the trial court is affirmed.