COLORADO COURT OF APPEALS                                    **2016COA130**

Court of Appeals No. 15CA1252
Montrose County District Court No. 14CV30176
Honorable Mary E. Deganhart, Judge

Amy Fischer and Roger Fischer,

Plaintiffs-Appellees,

v.

Colorow Health Care, LLC; QP Health Care Services, LLC, d/b/a Vivage;
Beverly Cole; Michael Reinhardt; and Travis Young,

Defendants-Appellants.

ORDER AFFIRMED

Division II
Opinion by JUDGE WEBB
Ashby and Márquez*, JJ., concur

Announced September 8, 2016

Laszlo & Associates, LLC, Theodore E. Laszlo, Jr., Michael J. Laszlo, Boulder,
Colorado, The Meyer Law Firm, P.C., William R. Meyer, Boulder, Colorado, for
Plaintiff-Appellee

Fennemore Craig, David Gelman, Troy R. Rackham, Denver, Colorado, for
Defendant-Appellants Colorow Health Care, LLC, QP Health Care Services,
LLC, Beverly Cole, and Michael Reinhardt

Senter Goldfarb & Rice, L.L.C., Tiffaney A. Norton, Denver, Colorado, for
Defendant-Appellant Travis Young


*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2015.

¶ 1     In deciding the enforceability of an agreement to arbitrate under the Health Care Availability Act (HCAA), should the test be strict compliance or substantial compliance with the textual and typographical requirements of section 13-64-403, C.R.S. 2015? And if the test is strict compliance, does the absence of bold-faced type, required under section 13-64-403(4), doom the agreement? Neither of these questions has been answered in Colorado.

¶ 2     Plaintiffs, Amy Fischer and Roger Fischer, pleaded tort claims arising from the death of Charlotte Fischer (the decedent). Defendants, Colorow Health Care, LLC, QP Health Care Services, LLC, d/b/a Vivage, Travis Young, Beverly Cole, and Michael Reinhardt, appeal the trial court's order denying their motions to compel arbitration. Applying the strict compliance test, we conclude that because the arbitration agreement did not satisfy the bold-faced type requirement, it is unenforceable. Therefore, we affirm.

I.     Facts and Procedural History

¶ 3     Colorow Health Care, LLC, and its management company, QP Health Care Services, LLC, d/b/a Vivage, operate a long-term health care facility. When the decedent was admitted to the facility,

1

her daughter, acting under a power of attorney, signed an arbitration agreement. The decedent passed away while a resident of the facility. The circumstances of her death are disputed.

¶ 4    After plaintiffs brought this action, defendants moved to compel arbitration. Plaintiffs opposed the motions based on discrepancies between the wording and typography of the arbitration agreement and the requirements of section 13-64-403(3) and (4). Initially, the trial court granted the motion, but set a hearing on plaintiffs' attempt to rescind the agreement.

¶ 5    Following that hearing and additional briefing, the court reversed itself. It noted that while the arbitration agreement included most of the language required by section 13-64-403(3), "there are some typos and words omitted." It also pointed out that the agreement "contains the required language from section 13-64-403(4)," but this language is only in capital letters and is not in bold-faced type, as the statute requires. Explaining that "the entity seeking to enforce the arbitration agreement must be held to strict compliance with [the statutory] requirements," the court held that the agreement "is not valid and the Motions to Compel Arbitration are denied." However, the court did not make any

2

findings whether the decedent's attorney-in-fact had misunderstood the agreement when she signed it.

¶ 6 Defendants then filed this interlocutory appeal as of right under section 13-22-228(1)(a), C.R.S. 2015.

## II. Preservation and Standard of Review

¶ 7 The parties' motions, briefs, and arguments below preserved the issue of the validity of the arbitration agreement.

¶ 8 Statutory interpretation is subject to de novo review. *Lewis v. Taylor*, 2016 CO 48, ¶ 14.

## III. The Statute

¶ 9 Section 13-64-403 is a gatekeeper. It sets out specific language that an arbitration agreement must include to comply with the HCAA. Subsection 403(4) provides language that must appear "[i]mmediately preceding the signature lines for such an agreement, . . . [and] shall be printed in at least ten-point, bold-faced type . . . ." § 13-64-403(4). And "an agreement may . . . be declared invalid by a court if it is shown by clear and convincing evidence that . . . [t]he agreement failed to meet the standards for such agreements." § 13-64-403(10)(a).

## IV. The Arbitration Agreement

¶ 10    The arbitration agreement between defendants and the decedent's daughter, as her representative, covers two-and-a-half pages. The first page and two-thirds of the second page define the claims and the parties subject to the agreement. Next, the agreement parrots the required language from subsection 403(3), in regular typeface, but with a few typographical errors and minor departures from the statutory text.

¶ 11    After the subsection 403(3) text, the agreement quotes the required language from subsection 403(4). This text was capitalized, and in twelve-point font, but in regular — as opposed to bold — typeface:

> NOTE: BY SIGNING THIS AGREEMENT YOU ARE AGREEING TO HAVE ANY ISSUE OF MEDICAL MALPRACTICE DECIDED NY [sic] NEUTRAL BINDING ARBITRATION RATHER THAN [sic] JURY OR COURT TRAIL [sic].
>
> YOU HAVE THE RIGHT TO SEEK LEGAL COUNSEL AND YOU AND [sic] RIGHT TO RESCIND THIS AGREEMENT WITHIN NINETY DAYS FROM THE DATE OF SIGNATURE BY BOTH PARTIES UNLESS THE AGREEMENT WAS SIGNED IN CONTEMPLATION OF HOSPITALIZATION IN WHICH CASE YOU HAVE NINETY DAYS AFTER DISCHARGE OR

RELEASE FROM THE HOSPITAL TO RESCIND
THIS AGREEMENT.

Except as noted, this language nearly mirrors the text required by subsection 403(4).

## V.    Validity of the Arbitration Agreement

¶ 12    Defendants concede that the text required by subsection 403(4) is not in bold-faced type and that this text, as well as the text required by subsection 403(3), contained some typographical errors.  But they contend section 13-64-403 requires only substantial compliance with its provisions.  And according to defendants, the arbitration agreement satisfies a substantial compliance test because the errors were minor and the language that should have been in bold-faced type was in all caps and in a larger font than the statute requires — twelve-point, while the statute only requires "at least ten-point."

¶ 13    Plaintiffs respond that the arbitration agreement must strictly comply with section 13-64-403, and because admittedly it did not, it is invalid.  We agree with plaintiffs that the statute requires strict compliance.  And based on the complete lack of bold-faced type, we also agree that the agreement is invalid.  By affirming denial of the

5

motions to compel arbitration on this basis, however, we need not consider whether other anomalies in the agreement — dismissed by defendants as trivial typographical errors — would survive a strict compliance test.

### A.  Statutory Construction Principles

¶ 14    When interpreting a statute, a court's primary goal is to discern the legislature's intent.  *See Pinnacol Assurance v. Hoff*, 2016 CO 53, ¶ 48.  "To divine this intent, our first recourse is the plain language of the statute, and we refrain from rendering judgments that are inconsistent with the intent evidenced by such language."  *Colo. Motor Vehicle Dealer Bd. v. Freeman*, 2016 CO 44, ¶ 8.  A court may discern the legislature's intent by examining the plain language "within the context of the statute as a whole."  *Lewis*, ¶ 20.

¶ 15    If a statute is ambiguous, a court may examine its legislative history to discern legislative intent.  *United Guar. Residential Ins. Co. v. Dimmick*, 916 P.2d 638, 641 (Colo. App. 1996).  Wherever possible, a statute should be construed "in a manner that gives effect to all its . . . policy objectives, and not in a way that renders one or more of its . . . goals inoperative."  *Copeland v. MBNA Am.*

*Bank, N.A.*, 907 P.2d 87, 90 (Colo. 1995). But in all events, a court must avoid an interpretation that "leads to an absurd result." *Concerned Parents of Pueblo, Inc. v. Gilmore*, 47 P.3d 311, 313 (Colo. 2002).

¶ 16    These principles are familiar. But applying them to section 13-64-403 involves several twists.

## B.    Application

¶ 17    According to plaintiffs, the arbitration agreement fails because it did not strictly comply with section 13-64-403 in two ways: first, the statutory language was not in bold-faced type, and, second, the text did not precisely mirror the statutory language.

¶ 18    The initial contention raises two related questions of first impression. Colorado courts have not decided whether section 13-64-403 demands strict compliance. Nor have they addressed whether failure to satisfy a statutory bold-faced type requirement means that the document must be invalidated under a strict compliance test.[1] We begin with the first question, as answering it

---

[1] Out-of-state authority is mixed. *Compare Caspe v. Aaacon Auto Transp., Inc.*, 658 F.2d 613, 616 (8th Cir. 1981) (noting that a clause without bold-faced type did not achieve the purpose of standing out and attracting the reader's attention), *and Niewind v.*

in the negative would moot the second question, considering the criteria of plain language, context, and purpose.

1. Whether Section 13-64-403 Demands Strict Compliance

a. Plain Language

¶ 19    Section 13-64-403 says that an arbitration agreement "shall" satisfy the statute's various requirements. *See, e.g.,* § 13-604-403(3) ("Any such agreement *shall* have the following statement . . . .") (emphasis added); § 13-64-403(4) (noting that the "notice *shall* be printed in at least ten-point, bold-faced type") (emphasis added); § 13-64-403(6) ("The patient *shall* be provided with a written copy . . . .") (emphasis added).

---

*Carlson,* 628 N.W.2d 649, 652 (Minn. Ct. App. 2001) ("If the legislature had merely intended to require that notice be set out in a manner likely to bring it to the attention of the buyer, it would have said so."), *with Cavalier Homes of Ala., Inc. v. Sec. Pac. Hous. Servs., Inc.,* 5 F. Supp. 2d 712, 718 (E.D. Mo. 1997) ("[T]he Court concludes that substantial compliance with the statute is sufficient and the failure to place the statutory notice in bold type does not preclude application of the statute."), *and Fabulous Fur Corp. v. United Parcel Serv.,* 664 F. Supp. 694, 697-98 (E.D. N.Y. 1987) ("[D]efendant's only failure to comply with the ICC order consisted of the failure to use a bold-print type on its bill of lading. We find that as a matter of law this was equivalent to substantial compliance with the ICC order."), *and People v. Williams,* 972 N.E.2d 1265, 1269-70 (Ill. App. Ct. 2012) (bail bond form substantially complied with statute even though text was not in bold-faced type as required by statute; party was not prejudiced by noncompliance with the statute).

¶ 20    "The word 'shall' connotes a mandatory requirement." *Willhite v. Rodriguez-Cera*, 2012 CO 29, ¶ 17. Colorado courts have held that mandatory statutory language requires strict compliance with its terms. *See, e.g., E. Lakewood Sanitation Dist. v. Dist. Court*, 842 P.2d 233, 236 (Colo. 1992) ("The presence of the word 'shall' in the clause . . . dictates th[e] unambiguous reading[,]" which is strict compliance.); *Postlewait v. Midwest Barricade*, 905 P.2d 21, 23-24 (Colo. App. 1995) (concluding that a party must strictly comply with a statute that uses "shall"); *see also* 3 Norman J. Singer & J.D. Shambie Singer, *Sutherland Statutory Construction* § 57:12 (7th ed. 2012) ("The effect of holding a statute mandatory is to require strict compliance with its letter in order to uphold proceedings or acts pursuant thereto or to enable persons to acquire rights under it.").[2]

---

[2] Courts outside of Colorado are in accord. *See, e.g., State v. Banks*, ___ A.3d ___, 2016 WL 3521973, at *12 (Conn. July 5, 2016) ("When a statutory provision involving the power of a public officer or body is mandatory, strict compliance is required and the failure to strictly comply invalidates all further proceedings."); *Bendell v. Educ. Officers Electoral Bd. for Sch. Dist. 148*, 788 N.E.2d 173, 178 (Ill. App. Ct. 2003) ("Inasmuch as section 10-4 is mandatory, compliance with its provisions must be strict rather than substantial."); *Brown v. Harper*, 761 S.E.2d 779, 780 (S.C. Ct. App. 2014) ("The plain and mandatory language of section 63-9-340 indicates the legislature intended strict compliance."), *aff'd*, 766 S.E.2d 375 (S.C. 2014).

¶ 21    Undaunted, defendants cite several Colorado cases holding that statutes containing mandatory language required only substantial compliance.  But none of these cases interpreted section 13-64-403.  As well, their facts are distinguishable.[3]  Even so, while the repeated use of "shall" favors interpreting section 13-64-403 to demand strict compliance, this arguably contrary authority at least cautions that "shall" alone should not end the inquiry.

¶ 22    Continuing with the plain language of the statute, section 13-64-403 sets forth the requirements for a valid arbitration agreement.  Such an agreement "divests the trial court of

---

[3] In *Woodsmall v. Regional Transportation District*, 800 P.2d 63, 67 (Colo. 1990), for example, the court concluded that a statute with mandatory language only required substantial compliance. However, the legislative history of the statute "clearly indicate[d] that the sponsor of the [statute] did not intend to create a standard of absolute or literal compliance with the notice requirement[.]" *Id.* at 68.  By contrast, here, the parties do not cite any relevant legislative history, and our review reveals none.  Hence, we need not decide whether to follow cases espousing the minority view that a court may consider legislative history, without first holding a statute to be ambiguous.  *See, e.g., Lot Thirty-Four Venture, L.L.C. v. Town of Telluride*, 976 P.2d 303, 306 (Colo. App. 1998) ("If the statutory language is clear and unambiguous, the statute should be applied as written.  Nevertheless, we may also consider other indicia of legislative intent, such as the object to be attained, the legislative history, and the consequences of the particular construction.") (citation omitted), *aff'd*, 3 P.3d 30 (Colo. 2000).

jurisdiction over all the questions that are submitted to arbitration, pending the conclusion of arbitration." *City & Cty. of Denver v. Dist. Court*, 939 P.2d 1353, 1370 (Colo. 1997). Thus, section 13-64-403 can be characterized as a jurisdictional statute. And jurisdictional statutes typically demand strict compliance. *See, e.g., Finnie v. Jefferson Cty. Sch. Dist. R-1*, 79 P.3d 1253, 1255-56 (Colo. 2003) (noting that a statute that set out "jurisdictional prerequisite[s] to suit" demands strict compliance with its terms).

¶ 23    At the same time, as defendants point out, section 13-64-403 — and for that matter, the rest of the HCAA — is silent whether strict compliance or mere substantial compliance will satisfy its requirements. Even so, dozens of other Colorado statutes expressly permit substantial compliance. *See, e.g.*, § 8-47-104, C.R.S. 2015 ("Substantial compliance with the requirements of articles 40 to 47 of this title shall be sufficient . . . ."); § 31-12-107(1)(e), C.R.S. 2015 ("All petitions which substantially comply with the requirements set forth . . . shall be deemed sufficient."). By contrast, only six Colorado statutes demand strict compliance. *See, e.g.*, § 10-3-302, C.R.S. 2015 (insurance companies must "strictly comply" with section 10-3-201, C.R.S. 2015). This imbalance shows that the

General Assembly is much more likely to clarify its intent by addressing substantial compliance than strict compliance.

¶ 24     Confirming our understanding of "shall" and the jurisdictional implications, section 13-64-403's silence on substantial compliance further suggests that strict compliance is required.  *See In re Williamson Vill. Condos.*, 653 S.E.2d 900, 904-05 (N.C. Ct. App. 2007) ("[E]ven where the General Assembly uses mandatory language such as 'shall' or 'must,' it may still excuse noncompliance with the use of a 'substantial compliance' clause."), *aff'd*, 669 S.E.2d 310 (N.C. 2008).

### b.    Context

¶ 25     Turning to other subsections of section 13-64-403 for context, subsection 403(10)(a) provides:

> Even where it complies with the provisions of this section, such an agreement may nevertheless be declared invalid by a court if it is shown by clear and convincing evidence that . . . [t]he agreement failed to meet the standards for such agreements as specified in this section[.]

Plaintiffs read this language as providing an exception to enforcing an arbitration agreement.

¶ 26    True enough, Colorado cases have pointed out that a statutory exception suggests that outside the scope of the exception, strict compliance is required.  *See, e.g., Grandote Golf & Country Club, LLC v. Town of La Veta*, 252 P.3d 1196, 1201 (Colo. App. 2011) (noting that the existence of a good cause exception suggests strict compliance in the absence of good cause).  Unlike the good cause exception in *Grandote*, however, subsection 403(10)(a) does not provide any criteria for deciding when noncompliance leads to invalidity.  And "[u]sually the word 'may" denotes a grant of discretion and is interpreted as permissive." *People v. Valadez,* 2016 COA 62, ¶ 17.

¶ 27    Thus, this subsection could be read as creating unbridled discretion to enforce an arbitration agreement, despite its deficiencies.  Such a reading would favor substantial compliance over strict compliance.

¶ 28    But this reading misses the larger point — subsection 403(10)(a) is circular: the provision notes that "[e]ven where" an agreement meets the requirements of section 13-64-403, the agreement may be declared invalid if it does *not* meet the requirements of section 13-64-403.  Given this inartful drafting,

13

whether or how subsection 403(10)(a) could affect interpretation of section 13-64-403 as a whole presents a conundrum that we decline to unravel. *See Concerned Parents of Pueblo, Inc.*, 47 P.3d at 314 ("If the 'person' performing the service, to whom the statute refers, is the organization serving young people itself, then the statute presents a circular conundrum."). Instead, we seek clearer guidance from the General Assembly's stated purpose in enacting section 13-64-403.

### c. Statutory Purpose

¶ 29    Assessing the purpose of section 13-64-403 is "critical" in determining the degree of compliance that the statute requires. *Wainscott v. Centura Health Corp.*, 2014 COA 105, ¶ 26 (citation omitted); *see also Charnes v. Norwest Leasing, Inc.*, 787 P.2d 145, 147 (Colo. 1990) ("We have approved of a rule of substantial compliance with a statute when such a rule serves the purposes of the statute.").

¶ 30    First, consider that the overall purpose of the HCAA is to "assure the continued availability of adequate health care services to the people of this state by containing the significantly increasing costs of malpractice insurance for medical care institutions and

14

licensed medical care professionals . . . ." § 13-64-102(1), C.R.S. 2015. Yet, as to this overall purpose, neither party argues, nor do we discern, any nexus to either horn of the strict compliance versus substantial compliance dilemma.

¶ 31 Next, consider the more specific objective that "an arbitration agreement be a voluntary agreement between a patient and a health care provider . . . ." § 13-64-403(1); *see also Moffett v. Life Care Ctrs. of Am.*, 219 P.3d 1068, 1074 (Colo. 2009) (noting that the "precise language" of section 13-64-403's requirements acts as a procedural safeguard, protecting patients from unwittingly entering into arbitration agreements); *Colo. Permanente Med. Grp., P.C. v. Evans*, 926 P.2d 1218, 1227 n.17 (Colo. 1996) (same).

¶ 32 Section 13-64-403's textual and typographical requirements ensure that the signatory to an arbitration agreement receives specific information in a prominent format. And everyone would agree that if the signatory misunderstood such an agreement because of content or format deficiencies, the signatory likely did not enter into it voluntarily. *Cf. People v. Alexander*, 797 P.2d 1250, 1256 (Colo. 1990) (noting that to establish the voluntariness of a plea, the record must show defendant understood the rights he was

15

waiving by pleading guilty).  Thus, a closer look shows that these typographical and textual requirements are proxies for voluntariness.

¶ 33   Defendants do not explain how substantial compliance either directly furthers voluntariness or indirectly advances it by increasing understanding.  Nor do we see that they could make either showing.  To the contrary, for the following reasons, substantial compliance creates a greater risk of misunderstanding than does strict compliance.

¶ 34   Of course, substantial compliance could sometimes achieve the same level of understanding as strict compliance.  Still, because understanding is subjective, a substantial compliance test would burden a patient or the patient's representative to show that for lack of complying language and typography, the effect of an arbitration agreement was not understood.  Thus, substantial compliance inflicts the costs and uncertainty of litigating understanding, as a proxy for voluntariness, on the patient or representative.  And the patient or representative would have to carry that burden in the face of language — albeit noncompliant with the statute — describing the agreement's effect.  *Cf. In re*

*Rosen*, 198 P.3d 116, 119 (Colo. 2008) ("[W]e cannot say, as a matter of law, that no reasonable fact finder could be unconvinced by the circumstantial evidence of the respondent's subjective intent.").

¶ 35    Even worse, resolving understanding on a case-by-case basis under a substantial compliance standard could lead to inconsistent results.  For example, one trial court might conclude that regular-faced type, but in sixteen-point font, substantially complies with subsection 403(4).  Another court may reach the opposite conclusion, reasoning that even sixteen-point font lacks the impact of bold-faced type.  And therein lies the problem — substantial compliance is inherently elastic.  *See Grp., Inc. v. Spanier*, 940 P.2d 1120, 1122 (Colo. App. 1997) ("Substantial compliance is less than absolute, but still requires a significant level of conformity."); *see also Myears v. Charles Mix Cty.*, 566 N.W.2d 470, 474 (S.D. 1997) ("What constitutes substantial compliance with a statute is a matter depending on the facts of each particular case.") (citations omitted).

¶ 36    By contrast, under a strict compliance test, the burden would fall on the health care facility to show strict compliance with section 13-64-403.  After all, the facility — not the patient or the patient's

17

representative — prepared the agreement. Unlike the patient's burden under a substantial compliance standard, the health care facility's burden would be low, given the ease of complying with section 13-64-403's requirements by quoting the language verbatim and adhering to the unambiguous typographical requirements. Thus, under this standard, voluntariness would not be at risk merely because of a patient's or representative's difficulty in proving subjective misunderstanding of an agreement.

¶ 37    As well, the results would be consistent: if section 13-64-403's requirements were met, the agreement would be valid. A statutory interpretation producing consistent results is preferable over one that produces inconsistent results. *Cf. United States v. Dion*, 752 F.2d 1261, 1267 (8th Cir. 1985) (noting that one analytical test is "more desirable" because it leads to "more consistent results," among other reasons); *Sportwear Hosiery Mills v. Comm'r*, 129 F.2d 376, 379 (3d Cir. 1942) ("[W]e think that the construction offered by the Commissioner leads to more consistent results and presumably, therefore, is within the Congressional intent.").

¶ 38    Given all this, the General Assembly's stated purpose —

voluntariness of arbitration agreements — is better served by

demanding strict compliance with section 13-64-403.

¶ 39    In sum, based on these three factors — plain language,

context, and purpose — we conclude that section 13-64-403 calls

for strict compliance.  This conclusion accords with dicta in which

the supreme court said that noncompliance with section 13-64-403

"alone would render the agreement unenforceable."  *Allen v.

Pacheco*, 71 P.3d 375, 381 (Colo. 2003); *see also Evans*, 926 P.2d at

1228 (noting that an arbitration agreement "must comport with the

other measures" in section 13-64-403).  But this conclusion does

not resolve the consequences of noncompliance.

2.    Whether Lack of Bold-Faced Type Dooms the Agreement

a.    Absurd Results

¶ 40    Defendants' argument that invalidating an agreement based

on a lack of bold-faced type leads to an absurd result — because

the arbitration agreement still contained the requisite wording and

in a typographically prominent format — misses the mark.

¶ 41    Defendants begin with a false analogy: a strict compliance

standard would invalidate otherwise adequate agreements where,

for example, the agreement substituted synonyms for statutorily required words. To avoid this absurd result, they continue, strict compliance must excuse minor departures from statutory requirements that could have had no practical effect on the reader. And according to defendants, this same rationale applies to the absence of bold-faced type: to avoid an absurd result, this anomaly too must be excused, even under a strict compliance standard, where it had no practical effect on the reader.

¶ 42 Not so fast. This analogy equates substituting a synonym in an agreement with failing to use a required typeface. But we know that by definition, substituting a synonym could not have *any* effect. *See Webster's Third New Int'l Dictionary* 2320 (2002) ("A [synonym is a] word having the same meaning as another word."). The opposite is true for the failure to use bold-faced type. *See Caspe v. Aaacon Auto Transp., Inc.*, 658 F.2d 613, 616 (8th Cir. 1981) (noting that bold-faced type allows language to "stand out and attract the reader's attention"); *Stauffer Chem. Co v. Curry*, 778 P.2d 1083, 1092 (Wyo. 1989) (acknowledging that bold-faced type allows words to "stand out prominently from surrounding words").

¶ 43　In the absence of any authority holding that strict compliance with a bold typeface requirement produces an absurd result, we reject defendants' contention.

### b.　Public Policy

¶ 44　Finally, defendants' argument that Colorado's "strong public policy in favor of arbitration[,]" *Braata, Inc. v. Oneida Cold Storage Co., LLP*, 251 P.3d 584, 590 (Colo. App. 2010), compels enforcing the arbitration agreement, even in the absence of bold-faced type, also falls short.

¶ 45　To begin, the HCAA recognizes this policy. But it also acknowledges that noncompliant agreements are inconsistent with public policy. *See* § 13-64-403(2) ("Any agreement . . . for binding arbitration . . . that conforms to the provisions of this section shall not be deemed contrary to the public policy of this state, except as provided in subsection (10) of this section."); *see also Braata, Inc.*, 251 P.3d at 587 (noting that the strong policy in favor of arbitration "does not trump statutory plain language").

¶ 46　As well, the policy favoring arbitration is a tie-breaker used to "construe any ambiguities." *BFN-Greeley, LLC v. Adair Grp., Inc.*, 141 P.3d 937, 940 (Colo. App. 2006). But the discrepancies

between the arbitration agreement and the statutory requirements do not involve ambiguities. Nor do defendants cite, and we have not found in Colorado, authority holding that that the policy favoring arbitration tilts the playing field on which courts decide the threshold question of whether an arbitration agreement is valid. Thus, we conclude Colorado's policy in favor of arbitration does not change our conclusion.

## VI.    Conclusion

¶ 47    That the arbitration agreement entirely lacked bold-faced type is undisputed, and we have concluded that section 13-64-403 demands strict compliance. Therefore, clear and convincing evidence shows that the agreement violated section 13-64-403(4). And invalidating it for the lack of bold-faced type neither creates an absurd result nor violates public policy favoring arbitration. Having invalidated the agreement on this basis, we need not determine whether the agreement is also invalid because of typographical errors and minor wording discrepancies.

¶ 48    The order of the trial court denying the motions to compel arbitration is affirmed.

JUDGE ASHBY and JUDGE MÁRQUEZ concur.