Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us.  Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
June 11, 2018

**2018 CO 52**

**No. 16SC814, Colorow Health Care, LLC v. Fischer—Health Care Availability Act—Statutory Construction—Alternative Dispute Resolution.**

Section 13-64-403, C.R.S. (2017), of the Health Care Availability Act governs arbitration agreements between patients and health care providers.  Under section 13-64-403(4), such agreements must contain a certain notice to patients to help ensure that they enter the agreements voluntarily, and the notice must be emphasized by at least ten-point font and bold-faced type.  The agreement here contained the notice in twelve-point font, but it was not bold-faced.  The court of appeals determined the statute requires strict compliance and that the agreement therefore failed for lack of bold-faced type.

The supreme court holds that  section 13-64-403 requires only substantial compliance.  The court further concludes the agreement here substantially complied with the formatting requirements of section 13-64-403, notwithstanding its lack of bold-faced type.  Accordingly, the supreme court reverses the judgment of the court of appeals and remands for further proceedings consistent with the opinion.

**The Supreme Court of the State of Colorado**
2 East 14th Avenue • Denver, Colorado 80203

**2018 CO 52**

**Supreme Court Case No. 16SC814**
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 15CA1252

**Petitioners:**

Colorow Health Care, LLC; QP Health Care Services, LLC, d/b/a Vivage; Travis Young; Beverly Cole; and Michael Reinhardt,

v.

**Respondents:**

Amy Fischer and Roger Fischer.

**Judgment Reversed**
*en banc*
June 11, 2018

**Attorneys for Petitioners Colorow Health Care, LLC; QP Health Care Services, LLC, d/b/a Vivage; Beverly Cole, and Michael Reinhardt:**
Hall & Evans, L.L.C.
David Gelman
Alan Epstein
   *Denver, Colorado*

**Attorneys for Petitioner Travis Young:**
Senter Goldfarb & Rice, LLC
Tiffaney Norton
   *Denver, Colorado*

**Attorneys for Respondents:**
Laszlolaw
Theodore E Laszlo, Jr.
Michael J. Laszlo
   *Boulder, Colorado*

The Meyer Law Firm, P.C.
William R. Meyer

*Boulder, Colorado*

**Attorneys for Amicus Curiae Colorado Health Care Association:**
Kittredge LLC
Daniel D. Domenico
*Denver, Colorado*

MRDLaw
Michael Francisco
*Colorado Springs, Colorado*

**Attorneys for Amicus Curiae Colorado Trial Lawyers Association:**
The Viorst Law Offices, P.C.
Anthony Viorst
*Denver, Colorado*

**JUSTICE HOOD** delivered the Opinion of the Court.
**JUSTICE HART** dissents, and **JUSTICE GABRIEL** joins in the dissent.
**JUSTICE MÁRQUEZ** does not participate.

¶1 When Charlotte Fischer moved into a nursing home, she received an admissions packet full of forms. Among them was an agreement that compelled arbitration of certain legal disputes. The Health Care Availability Act ("HCAA" or "Act") requires that such agreements contain a four-paragraph notice in a certain font size and in bold-faced type. Charlotte's agreement included the required language in a statutorily permissible font size, but it was not printed in bold. Charlotte's daughter signed the agreement on Charlotte's behalf.

¶2 After Charlotte died, her family initiated a wrongful death action against the health care facility in court. Citing the agreement, the health care facility moved to compel arbitration out of court. The trial court denied the motion, and the court of appeals affirmed, determining the arbitration agreement was void because it did not strictly comply with the HCAA.

¶3 In this opinion, we consider whether section 13-64-403, C.R.S. (2017), of the HCAA, the provision governing arbitration agreements, requires strict or substantial compliance. We hold it demands only substantial compliance. We further conclude the agreement here substantially complied with the formatting requirements of section 13-64-403, notwithstanding its lack of bold-faced type.

¶4 Accordingly, we reverse the judgment of the court of appeals and remand for further proceedings consistent with this opinion.

## I. Facts and Procedural History

¶5 At eighty-nine years of age, Charlotte Fischer was admitted to a long-term health care facility operated by Colorow Health Care, LLC ("Facility") and its management

company, QP Health Care Services, LLC. When Charlotte entered the Facility, her daughter Judith, acting as Charlotte's attorney-in-fact, filled out the admissions paperwork. As part of the entry packet, Judith signed an arbitration agreement ("Agreement"),[1] compelling arbitration for any claim arising from or relating to Charlotte's relationship with the Facility. The parties do not dispute that Judith signed it voluntarily on Charlotte's behalf.

¶6 Such arbitration agreements are governed by section 13-64-403 of the HCAA. This section instructs health care facilities to include certain language in these agreements, stating that patients need not sign them, and that care will not be withheld from those who refuse to do so. § 13-64-403(4). The HCAA also obliges health care facilities to print the language in at least ten-point, bold-faced type. Id. The Agreement included the HCAA-required language (albeit with some typos), in twelve-point type and all capital letters. But the Facility failed to print the language in bold-faced type.

¶7 Two years later, Charlotte died. According to Charlotte's granddaughter and grandson-in-law, Amy and Roger Fischer ("Fischers"), Charlotte died as a result of an assault committed by a Facility employee. The Facility disputes this. Despite the Agreement, the Fischers filed this wrongful death action against the Facility, its management company, and three of the Facility's employees in state court. The Facility filed a motion to compel arbitration. Because the Facility did not print the required language in bold-faced type, the Fischers claimed the Agreement was invalid. Agreeing

---

[1] The disputed portion of the Agreement is included as Appendix 2.

4

with the Fischers, the trial court denied the motion. The Facility filed an interlocutory appeal.

¶8    The court of appeals affirmed, concluding (1) the HCAA demands strict compliance, and (2) the failure to include the necessary bold-faced type invalidated the arbitration agreement. The Facility appealed both conclusions, and we granted certiorari.[2]

## II. Analysis

¶9    We begin by discussing the standard of review and general principles of statutory interpretation. Next, we describe the relevant portions of the HCAA. We then evaluate whether section 13-64-403 of that Act requires strict or substantial compliance with its terms. After considering the statute's text and purpose, we conclude it demands only substantial compliance. Last, we assess whether the Agreement substantially complies with the HCAA's formatting requirements. We conclude that it does.

---

[2] We granted certiorari to review the following issues:

1. Whether section 13-64-403, C.R.S. (2016), requires strict or substantial compliance with its provisions.
2. Whether the absence of bold typeface in the notice provision set forth in section 13-64-403(4), C.R.S. (2016), invalidates an otherwise compliant arbitration agreement under the substantial compliance standard.

The Fischers also claim the arbitration agreement did not satisfy the HCAA because of five minor differences between the Agreement and the language set forth in section 13-64-403(4). Because we granted certiorari to review only the bold-faced type issue, we decline to address the effects, if any, of these typographical errors.

## A. Standard of Review

¶10 Whether a statute requires strict or substantial compliance is a question of statutory construction, see, e.g., Finnie v. Jefferson Cty. Sch. Dist. R-1, 79 P.3d 1253, 1255–58 (Colo. 2003), which we review de novo. Lewis v. Taylor, 2016 CO 48, ¶ 14, 375 P.3d 1205, 1208.

¶11 In interpreting statutes, we endeavor to give effect to the intent of the General Assembly. Coloradans for a Better Future v. Campaign Integrity Watchdog, 2018 CO 6, ¶ 16, 409 P.3d 350, 353. To determine that intent, we begin with a statute's plain language. Id. We apply the text as written, reading words in context, § 2-4-101, C.R.S. (2017), and according them their ordinary meanings. Coloradans for a Better Future, ¶ 16, 409 P.3d at 353.

## B. The Health Care Availability Act

¶12 The General Assembly enacted the HCAA, §§ 13-64-101 to -503, C.R.S. (2017), to "assure the continued availability of adequate health care services . . . by containing the significantly increasing costs of malpractice insurance for medical care institutions." § 13-64-102(1). In harmony with that stated intent, section 13-64-403 of the HCAA provides patients and health care facilities "an option to settle their claims in a timely fashion through arbitration." Moffett v. Life Care Ctrs. of Am., 219 P.3d 1068, 1074 (Colo. 2009) (quoting Colo. Permanente Med. Grp., P.C. v. Evans, 926 P.2d 1218, 1227 n.17 (Colo. 1996) (citing S. Floor Deb. on S.B. 143, 56th Gen. Assemb., 2d Sess. (Feb. 25, 1988) (statement of Sen. Ted Strickland))). By permitting parties to select arbitration, the HCAA allows them to curb litigation expenses, which in turn limits the price of

6

malpractice insurance.  Id.  Because arbitration is efficient and cost effective, Colorado has long recognized it as a preferred method to settle disputes.  See, e.g., Lane v. Urgitus, 145 P.3d 672, 678 (Colo. 2006) ("In Colorado, arbitration is a favored method of dispute resolution.").

¶13     While "allow[ing] arbitration of disputes, [the HCAA] also contains protective provisions curbing abusive practices in obtaining agreements to arbitrate."  Moffett, 219 P.3d at 1073.  The General Assembly's stated goal for section 13-64-403 is to ensure "that an arbitration agreement be a voluntary agreement between a patient and a health care provider."  § 13-64-403(1) (emphasis added).  To that end, the HCAA imposes certain requirements on arbitration agreements.  Two are relevant to the case before us now.  First, the Act requires health care companies to include particular language explaining that these agreements are voluntary. § 13-64-403(4).[3]  Second, it requires that language be printed just above the signature line in at least ten-point font and bold-faced type.  Id.

¶14     Of course, health care companies have to fulfill their obligations under the HCAA.  But how perfectly must they conform to these requirements?  That is, does this law require strict or substantial compliance?  We turn to that question now.

_____

[3] See Appendix 1.

7

## C. Does the HCAA Require Strict or Substantial Compliance?

¶15 "Not all directives and requirements declared in statute law should be understood to have equal force." 3 Norman Singer & Shambie Singer, <u>Sutherland Statutory Construction</u> § 57:1 (7th ed. 2017). To be sure, all statutes demand compliance, but the term "'[c]ompliance' . . . without further modification, connotes an element of degree." <u>Woodsmall v. Reg'l Transp. Dist.</u>, 800 P.2d 63, 67 (Colo. 1990) (citations omitted). While some statutes require strict compliance, others demand only substantial compliance. <u>Id.</u> "Strict compliance leaves no margin for error and even technical deficiencies may be unacceptable. Substantial compliance is less than absolute, but still requires a significant level of conformity." <u>The Grp., Inc. v. Spanier</u>, 940 P.2d 1120, 1122 (Colo. App. 1997).

¶16 In this case, we find no easy answer from the General Assembly or from our prior decisions. The General Assembly often specifies the level of compliance it envisions, <u>see, e.g.</u>, § 8-47-104, C.R.S. (2017) (substantial compliance); § 10-3-302, C.R.S. (2017) (strict compliance), but it did not do so anywhere in the HCAA. And although this court has touched on the HCAA in the past, <u>see generally</u> <u>Moffett</u>, 219 P.3d 1068 (considering whether the HCAA allows a person possessing a power of attorney to sign an arbitration agreement on behalf of an incapacitated patient), we have never decided what level of compliance the statute requires.

¶17 The Fischers argue our decision in <u>Allen v. Pacheco</u>, 71 P.3d 375 (Colo. 2003), should control the analysis, claiming we determined there that section 13-64-403 demands strict compliance. We disagree. In that case, all parties stipulated that the

arbitration agreement at issue did not comply with section 13-64-403, either strictly or substantially. Allen, 71 P.3d at 381. We neither discussed nor decided the requisite level of compliance. This case, therefore, presents an issue of first impression.

¶18 In resolving this novel issue, we turn first to the text of the HCAA.

### 1. The HCAA's Text Does Not Require Strict Compliance

¶19 The court of appeals division analyzed three components of the HCAA's text: first, it examined the statute's use of the word "shall"; second, it read the statute to be jurisdictional; and third, it examined other provisions of the statute, finding them confusing. After analyzing the text, the division leaned towards strict compliance but wasn't entirely convinced, so it turned to the statute's purpose. We view the text somewhat differently, but we agree that it is inconclusive, and we must therefore delve into the statute's purpose. We examine each of the division's main points in turn.

¶20 First, the court of appeals analyzed section 13-64-403(4)'s use of the word "shall," pointing to conflicting authority about the word's meaning. On the one hand, the word "shall" connotes a mandate, which might suggest strict compliance is the proper standard. See, e.g., E. Lakewood Sanitation Dist. v. Dist. Court, 842 P.2d 233, 236 (Colo. 1992). But even when a statute includes the word "shall," this court has often read the statute to require only substantial compliance if doing so better furthers the statute's purpose. See, e.g., Finnie, 79 P.3d at 1258 ("[C]ase-by-case determinations of compliance, which consider principles of agency and equity, the purposes of the statute, and concerns of protecting [the public] from misrepresentations by [defendants], are required."); Woodsmall, 800 P.2d at 67 ("In determining whether a particular statutory

9

requirement has been satisfied, we have imposed a degree of compliance consistent with the objective sought to be achieved by the legislation under consideration."). Therefore, we agree with the court of appeals that the word "shall" can't, on its own, answer the question of whether a statute requires strict or substantial compliance.

¶21 Second, the court of appeals read the HCAA to be jurisdictional. Because jurisdictional statutes trigger strict compliance, the court of appeals found this weighed in favor of strict compliance. But as we see it, the HCAA is not a jurisdictional statute. "Jurisdiction is the authority of a court to hear and decide a case presented to it." Associated Gov'ts v. Colo. Pub. Utils. Comm'n, 2012 CO 28, ¶ 38, 275 P.3d 646, 653 (quoting Sanctuary House, Inc. v. Krause, 177 P.3d 1256, 1258 (Colo. 2008)). The Colorado Constitution vests courts with broad jurisdiction. Colo. Const. art. VI, §§ 1, 2, 3, 9. While the General Assembly may define and restrict this jurisdiction, "no statute will be held to so limit court power unless the limitation is explicit." State v. Borquez, 751 P.2d 639, 642 (Colo. 1988) (quoting In re A.W., 637 P.2d 366, 374 (Colo. 1981)). To that end, "[u]nder Colorado law, a statute is not jurisdictional unless it contains language expressly or by necessary implication limiting a court's jurisdiction." Lewis, ¶ 12 n.2, 375 P.3d at 1207 n.2. And subsection (4) has no jurisdictional language—it only requires that health care arbitration agreements contain a particular notice formatted in a particular way. § 13-64-403(4).

¶22 Moreover, even when a provision has a connection to jurisdiction, we have eschewed using a "jurisdictional" or "non-jurisdictional" label for determining whether strict or substantial compliance with the provision is required. Instead, we have

10

instructed that the strict/substantial determination must be based on the provision's purposes. For example, in <u>Finnie</u>, we considered whether subsection (3) of section 24-10-109, C.R.S. (2017), required strict or substantial compliance. 79 P.3d at 1255. Subsection (3) contains no jurisdictional language, but subsection (1) of the same statute provides, "Compliance with the provisions of this section shall be a jurisdictional prerequisite to any action brought under the provisions of this article, and failure of compliance shall forever bar any such action." § 24-10-109(1). Despite subsection (1)'s express jurisdictional language tied to "[c]ompliance with the provisions of this section," <u>id.</u>, we held that "a determination of whether a plaintiff complied with section 24-10-109(3) should consider whether the purposes of the statute were satisfied." <u>Finnie</u>, 79 P.3d at 1257–58. After analyzing the purposes, we concluded that only substantial compliance was required. <u>Id.</u> at 1258.

¶23 Last, we agree with the court of appeals that the statute's broader text doesn't resolve which level of compliance is required.

¶24 The Fischers argue that subsections (2) and (10), together, weigh in favor of strict compliance. Under subsection (2), an agreement that complies is presumed consistent with public policy, except it may be invalidated for reasons listed in subsection (10): if the agreement was induced by fraud or by disregarding the patient's right not to sign, or if the patient doesn't speak English, etc. § 13-64-403(2), (10). The Fischers point out that the presence of explicit exceptions in a statute can suggest the General Assembly intended to preclude excusing strict compliance for any other reason. <u>See</u> <u>Grandote Golf & Country Club, LLC v. Town of La Veta</u>, 252 P.3d 1196, 1201 (Colo. App. 2011).

11

¶25 But subsection (10) is too unclear to resolve what the rest of the statute couldn't. It allows courts to invalidate an agreement "[e]ven where it complies with the provisions of this section" if it does <u>not</u> "meet the standards for such agreements as specified in this section." § 13-64-403(10)(a). The court of appeals rightly described this language as "circular" and "inartful drafting." <u>Fischer v. Colorow Health Care, LLC</u>, 2016 COA 130, ¶ 28, __ P.3d __. The only conclusion we can safely draw from it is that we must look elsewhere for the answer to what level of compliance is required.

¶26 We conclude that the statute's plain language does not dictate the required level of compliance. Accordingly, we must analyze the statute's purpose. <u>See</u> <u>Finnie</u>, 79 P.3d at 1257–58.

### 2. Substantial Compliance Better Effectuates the General Assembly's Purpose

¶27 The key question we must answer in deciding between strict and substantial compliance is which standard better effectuates the General Assembly's purpose in enacting the HCAA. <u>See, e.g.</u>, <u>Woodsmall</u>, 800 P.2d at 67; <u>Charnes v. Norwest Leasing, Inc.</u>, 787 P.2d 145, 147 (Colo. 1990) ("We have required either substantial compliance or strict compliance with statutes in order to fulfill our 'duty to ascertain the legislative intent and give effect to such intent wherever possible.'" (quoting <u>ITT Diversified Credit Corp. v. Couch</u>, 669 P.2d 1355, 1361 (Colo. 1983))). In conducting that inquiry, we examine both the specific purpose of the typeface requirements in section 13-64-403(4) and the general purpose behind the HCAA.

12

¶28 First, the typeface requirements: The standards set forth in section 13-64-403(4) serve to ensure that patients enter arbitration agreements voluntarily by specifying that an advisement must be provided to the patient in bold-faced, ten-point (or larger) font. Moffett, 219 P.3d at 1074. These typeface requirements serve to emphasize the required language. Emphasizing this text encourages patients to read it and understand its importance.

¶29 While bold-faced text and minimum print size are ways to draw attention to the advisement, there are other—sometimes better—ways to do so. Highlighting the text in a particular color, underlining it, and printing it in all capital letters might also accomplish this goal. Moreover, even if a health care company perfectly adhered to the statute, it does not necessarily follow that bold-faced, ten-point font properly emphasizes the required text. Depending on the font used, strict compliance might nonetheless fail to draw attention to the voluntariness language. The following table illustrates this point. It includes one sentence of the text required by section 13-64-403(4), in six different fonts. While each option on the left would satisfy a strict-compliance standard, those on the right would not.[4]

---

[4] Amicus Curiae Colorado Health Care Association provided a similar table in its brief that we found helpful. We take judicial notice of the appearance of these fonts and formatting under CRE 201(b)(2) ("A judicially noticed fact must be one not subject to reasonable dispute in that it is . . . (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."). CRE 201(c) ("A court may take judicial notice, whether requested or not.").

| Strictly Compliant Text | Noncompliant Text |
|---|---|
| Calibri Light, size 10, bold:<br><br>NO HEALTH CARE PROVIDER SHALL REFUSE TO PROVIDE MEDICAL CARE SERVICES TO ANY PATIENT SOLELY BECAUSE SUCH PATIENT REFUSED TO SIGN SUCH AN AGREEMENT. | Arial Black, size 10, not bold:<br><br>**NO HEALTH CARE PROVIDER SHALL REFUSE TO PROVIDE MEDICAL CARE SERVICES TO ANY PATIENT SOLELY BECAUSE SUCH PATIENT REFUSED TO SIGN SUCH AN AGREEMENT.** |
| Kunstler Script, size 12, bold:<br><br>*No health care provider shall refuse to provide medical care services to any patient solely because such patient refused to sign such an agreement.* | Times New Roman, size 12, not bold:<br><br>NO HEALTH CARE PROVIDER SHALL REFUSE TO PROVIDE MEDICAL CARE SERVICES TO ANY PATIENT SOLELY BECAUSE SUCH PATIENT REFUSED TO SIGN SUCH AN AGREEMENT. |
| Browallia New, size 10, bold:<br><br>NO HEALTH CARE PROVIDER SHALL REFUSE TO PROVIDE MEDICAL CARE SERVICES TO ANY PATIENT SOLELY BECAUSE SUCH PATIENT REFUSED TO SIGN SUCH AN AGREEMENT. | Tahoma, size 14, not bold, underlined:<br><br><u>NO HEALTH CARE PROVIDER SHALL REFUSE TO PROVIDE MEDICAL CARE SERVICES TO ANY PATIENT SOLELY BECAUSE SUCH PATIENT REFUSED TO SIGN SUCH AN AGREEMENT.</u> |

¶30 We don't believe that the General Assembly intended to elevate form over function. And function—that is, notice to the patient consumer of services—is better served by the flexibility substantial compliance affords.

¶31 Second, we examine the general purpose animating the HCAA as a whole: keeping insurance costs low for medical providers. Section 13-64-403 facilitates this goal by encouraging arbitration, a relatively inexpensive and efficient means of dispute resolution when compared to litigation, see West v. Duncan, 210 P. 699, 699–700 (Colo. 1922) ("The obvious purpose of the [arbitration statute at issue in Duncan] is to enable the parties to a controversy to adopt a simple, summary, and inexpensive remedy as a means of finally settling their differences.").

14

¶32 The Fischers argue that using a substantial-compliance standard will invite litigation. In their view, a strict-compliance regime will better facilitate the goal of reducing litigation costs because it will be easy to tell which arbitration agreements satisfy the HCAA.

¶33 Reducing litigation over whether agreements comply with the HCAA misses the mark, though, when the cost is increased litigation over much more complex underlying disputes (i.e., the Fischers' wrongful-death claim). True enough, some litigation will ensue to define the contours of what it means to substantially comply with the HCAA. But that litigation will be relatively inexpensive compared to litigating the merits of the underlying claim. Litigation over whether an agreement substantially complies with the HCAA will be limited in scope—there's less room for factual disputes when the only relevant evidence will often be just the agreement itself. Compare that to litigation over a wrongful death claim like the one here, where the parties would likely fight at great expense over conflicting versions of events and possible causes of death by deposing eyewitnesses and enlisting dueling medical experts.

¶34 And unlike a strict-compliance standard, a substantial-compliance standard would send the right issues to court. A strict-compliance standard would invite litigation of the underlying merits any time an agreement suffered from a minor technical deficiency, even if the parties had executed the agreement voluntarily. But under substantial compliance, agreements with only minor technical deficiencies—those that don't bear on voluntariness in any material sense—will keep parties in arbitration and avoid the costs of full-blown merits litigation. A party seeking to

15

litigate the merits will have a colorable substantial-compliance issue to litigate only when an arbitration agreement suffers more serious deficiencies—those that could actually bear on voluntariness. So, the litigation that will result from imposing a substantial-compliance standard is more consistent with the General Assembly's purpose in enacting the HCAA.

¶35 Finally, we note that subsection (9) would better serve the statute's and the Act's purposes under substantial compliance. § 13-64-403(9). Subsection (9) instructs that noncompliance "shall constitute unprofessional conduct" for the purposes of licensing—and that "the appropriate authority" should take "disciplinary action" against a health care provider using a nonconforming agreement. This consequence is severe—with no exceptions. Punishing health care providers for minor typographical deficiencies that don't affect voluntariness wouldn't serve the statute's or the Act's purposes. But because more significant deficiencies in the HCAA-required disclaimer might affect voluntariness, punishing providers for failure to substantially comply would further the statute's purpose of ensuring voluntariness.

¶36 The Fischers do not persuade us otherwise. They contend that a substantial-compliance standard will lead to inconsistent results. But strict consistency isn't the objective. Voluntariness is. They also argue it's not hard to comply with section 13-64-403. We agree: All it takes is copying and pasting the required language and a few formatting changes. But the ease of compliance bears on neither the specific purpose of that section (ensuring voluntariness) nor the general purpose of the Act

16

(keeping medical malpractice costs low).  Without a nexus to the General Assembly's intent in passing the HCAA, the ease of compliance is irrelevant to our analysis.

¶37    For these reasons, we conclude a substantial-compliance standard is consistent with the general purpose of the HCAA, and the specific purpose of the typeface requirements set forth in section 13-64-403.  But did the arbitration agreement in this case substantially comply with the HCAA's formatting requirements?  We turn now to that question.

### D.  The Facility Substantially Complied with the HCAA's Formatting Requirements

¶38    We have addressed the question of substantial compliance in statutes pertaining to elections.  See City of Aurora v. Acosta, 892 P.2d 264, 267 (Colo. 1995) (ballot provision); Loonan v. Woodley, 882 P.2d 1380, 1383 (Colo. 1994) (initiative and referendum); Bickel v. City of Boulder, 885 P.2d 215, 227 (Colo. 1994) (election).  In that context, we have applied a three-factor test, announced in Bickel, to determine whether substantial compliance is met.  885 P.2d at 227; see also City of Aurora, 892 P.2d at 270; Loonan, 882 P.2d at 1384 (applying the Bickel factors).

¶39    In Bickel, we explained that courts deciding whether a party has substantially complied with requirements should

> consider factors including, but not limited to, the following: (1) the extent of the [party's] noncompliance [with the requirements], (2) the purpose of the provision violated and whether that purpose is substantially achieved despite the [party's] noncompliance, and (3) whether it can reasonably be inferred that the [party] made a good faith effort to comply or whether the [party's] noncompliance is more properly viewed as the product of an intent to mislead.

17

885 P.2d at 227. We find these factors useful in analyzing the HCAA. Applying the Bickel factors here, we conclude that the Agreement substantially complied with the HCAA's formatting requirements.

¶40 First, even though the Agreement did not include bold-faced type, the Facility's extent of noncompliance is minimal. The required language appeared in the Agreement (albeit with some typos not at issue here).[5] It was separated from the rest of the text. It appeared in all capital letters. It was printed in larger font than the rest of the text, and larger than the statute requires.

¶41 Second, the purpose behind section 13-64-403—voluntariness—is achieved despite the technical noncompliance. All parties agree that the Agreement was executed voluntarily. On its face, the Agreement included the required language indicating it was voluntary. Additionally, as Charlotte's treatment was not conditioned upon the execution of the Agreement, there was no coercion.

¶42 Third, it can reasonably be inferred that the Facility made a good faith effort to comply with the statute. It set the required provisions apart from the rest of the text, included the required language, and printed the statutory language in large font and in all-capital letters. The Facility may have been careless, but that does not necessarily mean it acted in bad faith. We perceive no effort to mislead, such as by burying the required text in fine print or by using a type of script that is unusually difficult to read.

---

[5] As previously noted, the language had some typographical errors that are not at issue before this court. Because we granted certiorari to review only the effect of the bold-faced type, we do not consider the effect, if any, of these typographical errors here.

¶43    We are satisfied that the Facility substantially complied with the formatting requirements set forth in section 13-64-403 of the HCAA.

### III. Conclusion

¶44    We hold section 13-64-403 of the HCAA demands only substantial compliance, and that the agreement here substantially complies with its formatting requirements, despite its lack of bold-faced type.  Because the court of appeals erred in holding otherwise, we reverse its judgment and remand for further proceedings consistent with this opinion.

**JUSTICE HART** dissents, and **JUSTICE GABRIEL** joins in the dissent.
**JUSTICE MÁRQUEZ** does not participate.

## APPENDIX 1: § 13-64-403(4)'S REQUIREMENTS

The statute requires the following:

> Immediately preceding the signature lines for such an agreement, the following notice shall be printed in at least ten-point, bold-faced type:

> NOTE: BY SIGNING THIS AGREEMENT YOU ARE AGREEING TO HAVE ANY ISSUE OF MEDICAL MALPRACTICE DECIDED BY NEUTRAL BINDING ARBITRATION RATHER THAN BY A JURY OR COURT TRIAL.

> YOU HAVE THE RIGHT TO SEEK LEGAL COUNSEL AND YOU HAVE THE RIGHT TO RESCIND THIS AGREEMENT WITHIN NINETY DAYS FROM THE DATE OF SIGNATURE BY BOTH PARTIES UNLESS THE AGREEMENT WAS SIGNED IN CONTEMPLATION OF HOSPITALIZATION IN WHICH CASE YOU HAVE NINETY DAYS AFTER DISCHARGE OR RELEASE FROM THE HOSPITAL TO RESCIND THE AGREEMENT.

> NO HEALTH CARE PROVIDER SHALL WITHHOLD THE PROVISION OF EMERGENCY MEDICAL SERVICES TO ANY PERSON BECAUSE OF THAT PERSON'S FAILURE OR REFUSAL TO SIGN AN AGREEMENT CONTAINING A PROVISION FOR BINDING ARBITRATION OF ANY DISPUTE ARISING AS TO PROFESSIONAL NEGLIGENCE OF THE PROVIDER.

> NO HEALTH CARE PROVIDER SHALL REFUSE TO PROVIDE MEDICAL CARE SERVICES TO ANY PATIENT SOLELY BECAUSE SUCH PATIENT REFUSED TO SIGN SUCH AN AGREEMENT OR EXERCISED THE NINETY-DAY RIGHT OF RESCISSION.

§ 13-64-403(4).

## APPENDIX 2: THE RELEVANT PART OF THE AGREEMENT

NOTE: BY SIGNING THIS AGREEMENT YOU ARE AGREEING TO HAVE ANY ISSUE OF MEDICAL MALPRACTICE DECIDED NY NEUTRAL BINDING ARBITRATION RATHER THAN JURY OR COURT TRAIL.

YOU HAVE THE RIGHT TO SEEK LEGAL COUNSEL AND YOU AND RIGHT TO RESCIND THIS AGREEMENT WITHIN NINETY DAYS FROM THE DATE OF SIGNATURE BY BOTH PARTIES UNLESS THE AGREEMENT WAS SIGNED IN CONTEMPLATION OF HOSPITALIZATION IN WHICH CASE YOU HAVE NINETY DAYS AFTER DISCHARGE OR RELEASE FROM THE HOSPITAL TO RESCIND THIS AGREEMENT.

NO HEALTH CARE PROVIDER SHALL WITHHOLD THE PROVISION OF EMERGENCY MEDICAL SERVICES TO ANY PERSON BECAUSE OF THAT PERSON'S FAILURE OR REFUSAL TO SIGN AN AGREEMENT CONTAINING A

---

PROVISION FOR BINDING ARBITRATION OF ANY DISPUTE ARISING AS TO PROFESSIONAL NEGLIGENCE OF THE PROVIDER.

NO HEALTH CARE PROVIDER SHALL REFUSE TO PROVIDE MEDICAL CARE SERVICES TO ANY PATIENT SOLELY BECAUSE SUCH PATIENT REFUSED TO SIGN SUCH AN AGREEMENT OR EXERCISED THE NINETY-DAY RIGHT OF RESCISSION.

Resident Signature: _Judith A. Cooper MD POA/POA_     Date: _11/9/2012_

Printed Name: _C. Lucille Fischer_

Legal Representative(s) Signature: _Judith G. Cooper MD POA/POA_     Date: _11/9/2012_

Printed Name(s): _Judith A. Cooper_

Colorow Care Center Representative Signature: _Denise Puckett LPN_     Date: _11/09/12_

Printed Name: _Denise Puckett LPN_

JUSTICE HART, dissenting.

¶45    The majority contends that the language of section 13-64-403 is ambiguous as to whether its provisions require strict or substantial compliance.  Because I think the majority is incorrect, I respectfully dissent.

¶46    The structure and language of section 13-64-403, C.R.S. (2017), suggest quite plainly that the legislature intended strict compliance with the statute's terms.  Use of the term "shall" in subsections 403(3) and 403(4) is one important piece of evidence that the legislature intended health care providers to use the specific language, set out in the specific typography provided in the statute.  I agree with the majority that, were use of the word "shall" in subsections 13-64-403(3) and (4) the only evidence of legislative intent in the language of the statute itself, the statute would be ambiguous.  But the general assembly did more than simply state that HCAA arbitration agreements "shall" include notice of the binding nature of the agreement or the right to rescind.  Subsection 403(3) sets forth, in quotation marks, the specific language that arbitration agreements "shall" include.  § 13-64-403(3).  And subsection 403(4) sets out a detailed, specifically worded four-paragraph notice that "shall be printed in at least ten-point, bold-faced type" and placed "[i]mmediately preceding the signature lines for such an agreement." § 13-64-403(4).  We have never found that this kind of legislative specificity—the provision of specific and detailed language that must be included in a notice in order to comply with the law—required only substantial compliance.  Instead, the cases referenced by the majority, in which we have concluded that the word "shall" required

1

only substantial compliance with a statutory command, involve very different statutory provisions with significantly less detailed compliance requirements. See, e.g., Woodsmall v. Reg'l Transp. Dist., 800 P.2d 63, 65–67 (Colo. 1990) (interpreting a statute that required notice from an injured claimant to include a "statement of the amount of monetary damages that is being requested" to be substantially complied with by a notice that included a statement that claimant was not yet sure of the damages amount); Finnie v. Jefferson Cty. Sch. Dist. R-1, 79 P.3d 1253, 1256 (Colo. 2003) (analyzing whether a statute that required notice to be served on one of three different governmental individuals or entities could be satisfied by service on the Risk Management Department of one of those entities).

¶47 Further evidence of the legislature's intent that the provisions of section 13-64-403 be strictly complied with lies in subsection 9 of section 403, in which the legislature provided that "[i]f a health care provider . . . fails to comply with the requirements of subsection (3) or (4) or both of this section," that failure "shall constitute unprofessional conduct as such term is used under the relevant licensing statute governing that particular care provider." § 13-64-403(9). The majority takes the severity of this consequence as evidence that the legislature must have intended substantial compliance. Maj. op. ¶ 35. Quite to the contrary, this language is a strong statement from the general assembly that it meant to have the provisions of section 13-64-403 complied with and was therefore willing to impose significant consequences on health care providers who fail to comply. Again, this language adds

2

further support to the conclusion that section 13-64-403 should be interpreted under a strict compliance standard.

¶48 The majority dismisses the significance of subsection 10 of section 13-64-403, which also supports strict compliance, with the conclusion that its language is "circular." Maj. op. ¶ 25. Far from being circular, this provision is quite straightforward. In fact, an example from the majority opinion itself offers a demonstration of the legislature's purpose in including this language. As the majority notes, the following text is strictly compliant with the provisions of (3) and (4): *No health care provider shall refuse to provide medical care services to any patient solely because such patient refused to sign such an agreement*. Maj. op. ¶ 29. If this Kunstler Script, twelve-point, bold sentence meant that an arbitration agreement containing it was necessarily compliant with the HCAA, form would indeed be elevated over function. But the legislature provided in subsection 13-64-403(10) that even an agreement that technically complies with the "provisions" of the statute "may nevertheless be declared invalid by a court if it is shown by clear and convincing evidence that [it] failed to meet the standards for such agreements as specified in this section." § 13-64-403(10)(a).

¶49 The use of the two distinct words "provisions" and "standards" in this subsection must serve some purpose. See Lombard v. Colo. Outdoor Educ. Ctr., Inc., 187 P.3d 565, 571 (Colo. 2008) (quoting Colo. Water Conservation Bd. v. Upper Gunnison River Water Conservancy Dist., 109 P.3d 585, 597 (Colo. 2005)) ("[W]hen examining a statute's language, we give effect to every word and render none

3

superfluous because we 'do not presume that the legislature used language idly and with no intent that meaning should be given to its language.'"). The "provisions" of the section are its specific terms—the mandatory language and typography set out by the general assembly. "Standards" are different. Black's Law Dictionary defines "standard[s]" as "criteri[a] for measuring acceptability, quality, or accuracy." Standard, Black's Law Dictionary (10th ed. 2014). Here, the legislature intended to ensure that arbitration agreements under the HCAA are entered into voluntarily. § 13-64-403(1) ("It is the intent of the general assembly that an arbitration agreement be a voluntary agreement between a patient and a health care provider . . . ."). Thus, subsection 10 ensures that even an agreement that strictly complies with the technical provisions of section 13-64-403 may nevertheless be invalidated if it is found to have been entered into without meeting the standards of voluntariness. An agreement that set forth the required notice in Kunstler Style, twelve-point, bold-faced type would quite likely fall under section 13-64-403(10)'s ambit of technically compliant yet still invalid agreements.

¶50 The use of the directive "shall," the provision of very specific and detailed language that is required to be used in HCAA-compliant arbitration agreements, and the provision of onerous penalties for failure to comply with the provisions of section 13-64-403 all demonstrate a legislative intent that the provisions of the law be complied with strictly. The fact that the legislature further provided that even a technically compliant notice might be invalidated if it did not comport with the legislative command that these binding agreements be entered into voluntarily further

4

demonstrates that the legislature meant to protect against coercion in no uncertain terms. Strict compliance better serves that purpose and is plainly suggested by the section's language and structure.

¶51 In my view, the substantial compliance rule set out by the majority today will indeed increase litigation. Take this very case. The majority avoids addressing the typographical errors included in the notice provided to the Fischers by hewing to the language of the question presented, which asks only whether the lack of bold-faced type rendered the notice invalid. But we should not ignore the other defects in the Agreement simply because the question presented did not list them as well. The validity of the Agreement is in front of us, and we should address whether the notice—both its typography and its language—complied with the HCAA. The question of whether this notice substantially complies with the HCAA is harder when we include all of its defects in our analysis. Not only was this notice not in the required bold-faced type, but its statement of the right to rescind reads as follows: "You have the right to seek legal counsel and you and right [sic] to rescind this agreement . . . ." This sentence does not accurately or adequately inform Charlotte or Judith Fischer of their right to rescind.[1] In addition to this nonsensical statement, the notice provision includes several

---

[1] The typographical error in the notice of right to rescind is rendered even more problematic by the fact that the contract states, immediately above the four paragraphs that purport to meet the requirements of section 13-64-103 that "this Arbitration Agreement may not rescinded [sic] by written notice to us from you within ninety days of signature." Accordingly, if anything, the mistyped notice suggested exactly the opposite of what the statute requires (i.e., that the Fischers had no right to rescind).

other typographical errors that make it different from the specific language set forth in detail in section 13-64-103. Does this constellation of errors nonetheless permit the conclusion that the notice provided here met a substantial compliance standard? I am not at all convinced that it does. It certainly does not meet the strict compliance standard that I believe the legislature intended.

¶52 Colorow Health Care presented this arbitration agreement to the Fischers in 2012. While I agree with the majority that we did not analyze the question of strict or substantial compliance in <u>Allen v. Pacheco</u>, 71 P.3d 375 (Colo. 2003), the lawyers who prepared this 2012 arbitration agreement were certainly on notice that we had stated in <u>Allen</u> that non-compliance with "the language and bold-faced type notice required by the HCAA . . . would render the agreement unenforceable." <u>Id.</u> at 381. And they were on notice that the legislature had provided specific language, in a particular typography, that HCAA arbitration agreements "shall" include. Compliance with the HCAA's provisions is not an onerous burden. Colorow Health Care should simply have followed the very clear rules set out by the statute and they should have done so in strict compliance with those rules.

¶53 Therefore, I respectfully dissent.

I am authorized to state that JUSTICE GABRIEL joins in this dissent.