**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 21, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

CARL FOGEL,

      Plaintiff - Appellee/Cross-
Appellant,

v.

SHELTER MUTUAL INSURANCE
COMPANY, a foreign insurance
company,

      Defendant - Appellant/Cross-
Appellee.

Nos. 24-1422 & 24-1440
(D.C. No. 1:23-CV-00111-MDB)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]

_____

Before **MATHESON**, **PHILLIPS**, and **ROSSMAN**, Circuit Judges.

_____

When two parties get into an auto accident, Colorado law entitles them to information about each other's insurance coverage. Upon request by a potential claimant, an insurer must disclose, among other things, a "copy" of "each known policy of insurance of the named insured . . . that is or may be relevant to the claim." Colo. Rev. Stat. § 10-3-1117(2)(a). If the insurer doesn't disclose the information within thirty days, the insurer owes the claimant $100 per day

---

[*] Except under the doctrines of law of the case, res judicata, and collateral estoppel, this order and judgment is not binding precedent. But it may be cited for its persuasive value, consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

until the disclosure is complete, plus attorneys' fees and costs incurred while collecting the penalty. *Id.* § 10-3-1117(3).

John Catalano struck Carl Fogel with his truck while Fogel was cycling. So Fogel contacted Catalano's insurer, Shelter Mutual Insurance Company, to request Catalano's policy information. Fogel learned from Catalano's attorney that Catalano was listed on four policies with Shelter: one for the Ford Ranger he drove during the collision, plus three others for different vehicles. Fogel requested copies of all four. But for over a year, Shelter produced only a copy of the Ranger policy, not copies of the other three.

Fogel sued to collect the statutory penalty. After both parties moved for summary judgment, the district court held that Shelter had violated Colorado's disclosure statute. It also held that Shelter owed Fogel $35,600—$100 for each day after the initial thirty that Shelter hadn't produced copies of Catalano's non-Ranger policies.

Both sides appealed. Shelter argues that the non-Ranger policies aren't policies that "[are] or may be relevant to the claim." And even if they are, Shelter says, it met its disclosure obligations by excerpting the four policies' relevant language—no need to send copies. Meanwhile, Fogel argues that because Shelter failed to produce copies of *three* policies, not just one, Shelter owed him *$300* for each day after the initial thirty that it hadn't produced them. He also asks us to award him attorneys' fees and costs for defending Shelter's appeal.

2

We affirm. Under Colorado's caselaw, we hold that section 10-3-1117(2)(a) unambiguously required Shelter to produce copies of the non-Ranger policies to Fogel. That means the policies in their entirety, not just excerpts. But we agree with Shelter that section 10-3-1117(3) authorizes just one penalty per claim, not one penalty for each unanswered request. So we deem Fogel entitled to fees and costs for defending Shelter's appeal, and we remand for further proceedings.

## BACKGROUND

**I.    Statutory Background**

This appeal involves two provisions of a Colorado auto-insurance statute. The first provision requires insurers to disclose certain policy information:

> Each insurer that provides or may provide commercial automobile or personal automobile liability insurance coverage to pay all or a portion of a pending or prospective claim shall provide to the claimant or the claimant's attorney via mail, facsimile, or electronic delivery, within thirty calendar days after receiving a written request from the claimant or the claimant's attorney, which request is sent to the insurer's registered agent, a statement setting forth the following information with regard to each known policy of insurance of the named insured, including excess or umbrella insurance, that is or may be relevant to the claim:
>
> > (i) The name of the insurer;
> >
> > (ii) The name of each insured party, as the name appears on the declarations page of the policy;
> >
> > (iii) The limits of the liability coverage; and
> >
> > (iv) A copy of the policy.

Colo. Rev. Stat. § 10-3-1117(2)(a). The second provision supplies a penalty for insurers' violations of the first provision:

> An insurer that violates this section is liable to the requesting claimant for damages in an amount of one hundred dollars per day, beginning on and including the thirty-first day following the receipt of the claimant's written request. The penalty accrues until the insurer provides the information required by this section. An insurer that fails to make a disclosure required by this section is also responsible for attorney fees and costs incurred by a claimant in enforcing the penalty.

*Id.* § 10-3-1117(3).

## II.    Factual Background

In March 2021, Catalano struck Fogel with his truck while Fogel was bicycling in Pueblo, Colorado. Fogel suffered serious injuries.

Fogel filed a claim with Catalano's insurer, Shelter. Fogel learned from Catalano's attorney that Catalano was a named insured on three policies: one for his Ford Ranger, which he drove during the collision; one for his Buick Lacrosse; and one for his grandson's Chrysler PT Cruiser. Fogel also learned that Catalano was an additional insured on a policy for his grandson's Ford Transit.

On February 1, 2022, Fogel requested policy information from Shelter under section 10-3-1117(2)(a). He filed four separate requests—one for each of Catalano's policies.[1]

---

[1] Fogel filed the requests with the Colorado Division of Insurance, Shelter's registered agent in the state. The agency said it promptly forwarded

*(footnote continued)*

4

Less than a week later, Shelter wrote back with what it called "information for each known policy of insurance" on Catalano. App. vol. II at 373. But it produced only a copy of the Ranger policy, not copies of the Lacrosse, PT Cruiser, or Transit policies.

On July 22, 2022, Shelter wrote Fogel again to explain its "position regarding the insurance available." *Id.* at 457. Shelter began by quoting language that it said appeared in all four of Catalano's policies. It then analyzed the language to explain its position that the non-Ranger policies didn't cover Fogel's claim. Otherwise, Shelter didn't disclose what the non-Ranger policies said.

Fogel eventually settled his claim.

## III. Procedural History

### A. Early Proceedings

In December 2022, Fogel sued Shelter in Colorado state court. He brought three penalty claims under section 10-3-1117—one for each of the still-unproduced policies. Based on the parties' diverse citizenship, Shelter removed the case to federal district court.

On February 23, 2023, as part of its required pretrial disclosures under Federal Rule of Civil Procedure 26(a)(1), Shelter finally produced to Fogel copies of the full Lacrosse, PT Cruiser, and Transit policies.

---

all four requests to Shelter. Yet Shelter said it received requests for only the Ranger and PT Cruiser policies, not the Lacrosse or Transit policies.

**B.    Summary Judgment on Liability**

Both parties moved for summary judgment. Shelter argued that because none of the non-Ranger policies covered the collision, none had to be produced under section 10-3-1117(2)(a) as a policy "that is or may be relevant to the claim." Fogel countered that Shelter had to produce any policy with "a mere possibility" of coverage, including the non-Ranger policies. *See* App. vol. I at 209–16. He also argued that under section 10-3-1117(3), Shelter owed him $100 per day per requested policy that remained unproduced past the thirty-day statutory deadline.

On liability, the district court granted summary judgment to Fogel. *Fogel v. Shelter Mut. Ins.*, 728 F. Supp. 3d 1171, 1181 (D. Colo. 2024). Unlike the parties, the court saw the "is or may be relevant" language as ambiguous. *See id.* at 1176–77. But based on the Colorado legislature's goals of "transparency in the insurance claims process," "encouraging settlement," and "preventing unnecessary litigation," the court read the words broadly. *See id.* at 1177–78 (citation omitted). So it held that Shelter needed to produce the non-Ranger policies to Fogel. *Id.* at 1179.

As for Shelter's penalty, the district court noted the parties' incomplete arguments and ordered the parties to file and brief a second motion for summary judgment on that issue. *See id.* at 1180–81.

6

### C.    Reconsideration & Summary Judgment on the Penalty

Not long after, Shelter asked the court to reconsider its liability ruling. Shelter argued that section 10-3-1117 is a penal statute, meaning that if the court held the text to be ambiguous, the court should have applied the rule of lenity in interpreting it.

The district court addressed both reconsideration and the second motion for summary judgment at a later hearing. The court began by denying Shelter's reconsideration request. It first suggested, without deciding, that Shelter had waived the lenity issue by not raising it earlier. The court then held that Shelter hadn't met "the high standard associated with a motion for reconsideration." App. vol. III at 633. Finally, the court explained that even if section 10-3-1117 were penal and thus implicated the rule of lenity, that rule applies only when a textual ambiguity is "grievous"—a standard that section 10-3-1117 didn't meet. *Id.* at 634.

The district court then considered the motion for summary judgment on the penalty. Fogel reiterated his argument that Shelter owed him $100 per day for each requested policy that remained unproduced past the statutory thirty-day deadline. Shelter countered that section 10-3-1117 authorizes just one penalty per insurance claim against the insurer, not one penalty for each unanswered request related to a claim. It added that no matter how the statute

structured its penalties, any penalties stopped accruing on July 22, 2022, when Shelter sent Fogel a letter quoting language from the four requested policies.[2]

The district court landed in the middle, granting summary judgment to Fogel but awarding a smaller penalty than he sought. The court held that section 10-3-1117 applied penalties per insurance claim, not per unanswered request. It then held that Shelter's July 2022 letter didn't meet Shelter's disclosure obligations. So the court calculated Fogel's penalty award at $35,600—$100 per day for the 356 days from March 4, 2022 (thirty-one days after Fogel's policy requests), to February 23, 2023 (when Shelter finally produced copies of the non-Ranger policies). The court also awarded Fogel attorneys' fees and costs.

### D.    Cross-Appeals

Both sides appealed. Shelter appeals both liability and the penalty, arguing that it wasn't liable under section 10-3-1117(2)(a) and that even if it were, any penalty stopped accruing as of its July 2022 letter to Fogel. Fogel appeals the penalty only, arguing that section 10-3-1117(3) multiplies the $100-

---

[2] Shelter also argued that there was a factual dispute about whether it had received the Lacrosse and Transit policies from its registered agent, the Colorado Division of Insurance.

per-day penalty by the number of unanswered requests. He also asks us to award him attorneys' fees and costs for defending Shelter's appeal.[3]

After oral argument, the Colorado Court of Appeals decided *Bohanan v. Esurance Property & Casualty Insurance*, --- P.3d ----, 2026 WL 304180 (Colo. App. Feb. 5, 2026), *cert. filed*, No. 2026SC158 (Colo. Mar. 18, 2026). *Bohanan* is Colorado's first appellate decision about the meaning of section 10-3-1117's "is or may be relevant" language. *See id.* at *3. Fogel notified us of the supplemental authority and, upon Shelter's unopposed request, we ordered supplemental briefing.

## JURISDICTION

The parties cross-appeal the district court's granting summary judgment on liability and the penalty. We have jurisdiction under 28 U.S.C. § 1291.

## STANDARD OF REVIEW

We review de novo a district court's summary-judgment rulings. *Thao v. Grady Cnty. Crim. Just. Auth.*, 159 F.4th 1214, 1226 (10th Cir. 2025). Summary judgment is appropriate only if "there is no genuine dispute as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing cross-motions for summary judgment, we draw all reasonable factual inferences "in favor of the party against whom the

---

[3] Pending this appeal and upon Shelter's posting a $35,600 bond, the district court stayed execution of its judgment and deferred determination of Fogel's attorneys' fees and costs.

motion under consideration [was] made." *Pirkheim v. First Unum Life Ins.*, 229 F.3d 1008, 1010 (10th Cir. 2000).

## DISCUSSION

Our task is to interpret and apply section 10-3-1117 under Colorado's rules of statutory construction. Using those tools, we hold that section 10-3-1117(2)(a) unambiguously required Shelter to produce copies of the non-Ranger policies to Fogel. We hold that section 10-3-1117(3) authorizes just one penalty for Shelter's failure to respond to Fogel's collective requests, not one penalty for each of those requests. And we hold that Shelter's decision to excerpt policy language, rather than send copies of the entire non-Ranger policies, didn't comply with section 10-3-1117(2)(a).

Because our interpretations eliminate any potential issues of material fact, and because they support the district court's judgments as a matter of law, we affirm the court's judgments, deem Fogel entitled to fees and costs for defending Shelter's appeal, and remand for further proceedings.

## I.    Rules of Construction

We interpret state statutes "to reach the same result that would be reached in state court." *Etherton v. Owners Ins.*, 829 F.3d 1209, 1223 (10th Cir. 2016). If a state's supreme court has interpreted a statute, we defer to that interpretation. *Id.* But if it hasn't, we try to predict how that court would rule. *Id.* In doing so, we consider the decisions of the state's lower courts and apply the state's rules of statutory construction. *Id.* at 1223–24. We may also consider

other courts' decisions about the statute at issue, the appellate decisions of other states "with similar legal principles," and "the general weight and trend of authority in the relevant area of law." *See Wade v. EMCASCO Ins.*, 483 F.3d 657, 666 (10th Cir. 2007) (citation modified).

When interpreting Colorado statutes, we start with the text. *Sentinel Colo. v. Rodriguez*, 577 P.3d 48, 53 (Colo. 2025). "[O]ur primary aim is to effectuate the legislature's intent." *Id.* We "respect the legislature's choice of language" by applying words and phrases "according to their plain and ordinary meanings" and neither adding nor subtracting words from the statute. *People ex rel. B.C.B.*, 569 P.3d 74, 79 (Colo. 2025). We consider "the entire statutory scheme," giving "consistent, harmonious, and sensible effect" to its parts. *Id.* And we avoid readings that render language "superfluous" or lead to "illogical or absurd results." *Id.* If, after all that, a statute is unambiguous, we apply the statute as written without resorting to other rules of construction. *Id.*

## II.    Liability — Section 10-3-1117(2)(a)

The parties dispute the meaning of section 10-3-1117(2)(a)'s requirement that insurers disclose information about "each known policy of insurance . . . that is or may be relevant to the claim." Shelter says that the requirement doesn't reach policies for vehicles that weren't involved in the collision. Fogel says it does.

The district court correctly held that Shelter violated section 10-3-1117(2)(a). In applying the statute's language to these facts, we are guided by

11

Colorado's caselaw. Against that backdrop, we conclude that section 10-3-1117(2)(a) unambiguously required Shelter to produce copies of the non-Ranger policies. So we affirm summary judgment for Fogel on liability.

\*       \*       \*

As mentioned, there is just one Colorado appellate decision—published or unpublished—that analyzes section 10-3-1117(2)(a)'s "is or may be relevant" language. That decision is *Bohanan v. Esurance Property & Casualty Insurance*, --- P.3d ----, 2026 WL 304180 (Colo. App. Feb. 5, 2026), *cert. filed*, No. 2026SC158 (Colo. Mar. 18, 2026). Again, without a decision by a state's supreme court, the decisions of the state's lower courts are highly persuasive on matters of state law. *See McWilliams v. Dinapoli*, 40 F.4th 1118, 1131 (10th Cir. 2022) ("[I]n the absence of convincing evidence that the [state's supreme] court would decide otherwise, we will follow a state intermediate court's interpretation . . . ." (citation modified)); *see also Etherton*, 829 F.3d at 1223; *N.H. Ins. v. TSG Ski & Golf*, 128 F.4th 1337, 1344 (10th Cir. 2025).

So we turn to *Bohanan*. In that case, a motorist ran a red light and struck Bohanan's car. 2026 WL 304180, at \*1. Presumably the motorist lacked insurance, because about an hour and a half later, a third party signed up for a policy naming the motorist as an additional insured. *See id.* The motorist later provided that policy information to Bohanan, who filed a bodily-injury claim with the insurer and requested "any . . . automobile policy information in connection with [her] claim." *Id.* at \*2.

12

The insurer began processing Bohanan's request but eventually realized that the collision occurred before the policy was purchased. *See id.* The insurer then denied Bohanan's claim on that ground. *Id.* Though the insurer informed Bohanan's counsel of the ground for denial, the insurer didn't produce a copy of the late-purchased policy (or any policy). *Id.*

About ten months later, Bohanan wrote to the insurer about its failure to respond to her request for policy information as required by section 10-3-1117(2)(a). *Id.* Several weeks after that, she wrote again. *Id.* Finally, over a year after Bohanan first requested it, the insurer produced a copy of the late-purchased policy. *See id.*

Bohanan sued to collect the $100 penalty for each day the late-purchased policy had remained unproduced. *See id.* The state district court held that the insurer had violated section 10-3-1117(2)(a)'s disclosure requirement because the policy was one "that is or may be relevant" to Bohanan's claim. *Id.* In so ruling, the court relied heavily on the federal district court's decision in this case. *See id.* at *4–5.

The Colorado Court of Appeals affirmed. *Id.* at *8. Also relying heavily on the federal district court's decision, the *Bohanan* court held that section 10-3-1117(2)(a) "unambiguously required [the insurer] to provide Bohanan's counsel with a copy of the [late-purchased] policy" within thirty days of Bohanan's requesting it. *See id.* at *5.

13

First, the court found it significant that, upon receiving Bohanan's request, the insurer "promptly determined that it issued a policy on the date of the car accident and that the policy may provide coverage" for the claim. *Id.* It was only after five weeks of investigating the collision that the insurer "ultimately conclud[ed] that the policy did not provide coverage." *Id.* In the court's view, "both the amount of time it took to assess the coverage issue and the initial confusion on both sides as to whether the loss could or would be covered make clear that during the statutory response period the policy was or may have been relevant to the claim." *Id.* (citation modified).

Second, the court rejected the insurer's argument that it was "excused . . . from producing the policy" based on its "unilateral decision that the policy did not provide coverage." *Id.* That rationale "would permit an insurer to reject a claimant's request for policy information any time the insurer concludes that no coverage exists, and to do so without ever producing a copy of the policy to the claimant." *Id.* Such a result, the court reasoned, would be "directly contrary to the language" of section 10-3-1117(2)(a). *Id.* at *6.

Third, the court rejected the insurer's argument that it "had no disclosure obligation when the request was received because, in its view, it is now clear that the policy did not provide coverage for the claimed loss." *Id.* The court held that whether a policy "is or may be relevant" doesn't depend on whether the policy ultimately applies, or even whether "the claimant is subsequently

14

found to be entitled to no damages in the underlying automobile accident." *Id.* (citation omitted).

Finally, the court rejected the insurer's argument that Bohanan's interpretation would "create[] enormous uncertainties and burdens for insurance companies by requiring them to find and produce long-expired policies that have no arguable relevance to the presented claim." *See id.* The court "decline[d] [the insurer's] invitation to imagine the outer parameters of the statute based on facts that [we]re not before [the court]." *Id.* Instead, the court held that it was "sufficient . . . to simply observe that the [late-purchased] policy . . . was or may have been relevant to the claim."[4] *Id.* (citation modified).

---

[4] The *Bohanan* court added that even if section 10-3-1117(2)(a) were ambiguous, "any ambiguity must be interpreted in accordance with the General Assembly's statement of purpose when enacting the statute." 2026 WL 304180, at *6. Section 10-3-1117's statement of purpose reads as follows:

> It is in the best interests of the citizens of this state to have transparency in the insurance claims process to further the public policy of encouraging settlement and preventing unnecessary litigation. Claimants and injured parties should fully understand the total amount of insurance coverage available to them. In addition, because payment of uninsured and underinsured motorist benefits covers the difference between the amount of the limits of any legal liability coverage and the amount of the damages sustained, it is important that the citizens of this state have accurate and reliable information about the amount of legal liability coverage available for a claim. Providing information to Colorado residents concerning the amount of liability coverage will:

*(footnote continued)*

15

*Bohanan*'s reasoning supports the district court's application of section 10-3-1117. In *Bohanan*, it took time "to assess the coverage issue," and there was "initial confusion on both sides as to whether the loss could or would be covered." *Id.* at \*5. Analogously, when Shelter wrote its July 2022 letter to Fogel explaining why the non-Ranger policies didn't apply, it took multiple pages to do so, quoting and interpreting intricate policy language. In each case, there was "a fundamental question of whether a policy [or policies] provide[d] coverage for [the] loss." *Id.* And that's enough to trigger the disclosure requirement, no matter whether a policy ultimately covers the claim.[5] *See id.* at \*6.

---

    (a) Help Colorado residents evaluate whether their uninsured or underinsured motorist coverage will be triggered; and

    (b) Allow an insurer who provides uninsured or underinsured motorist coverage or policies more time to evaluate and place reserves on claims.

Colo. Rev. Stat. § 10-3-1101(2). The court explained that this statement of purpose was "directly at odds with" the insurer's reading of the disclosure requirement, which would (1) "allow insurers to deny—or, at best, delay—the production of potentially relevant policy information and sow doubt rather than promote clarity" and (2) "perpetuate uncertainty and misunderstanding, which are the fertile breeding grounds of litigation." *Bohanan*, 2026 WL 304180, at \*6. Thus, the statement "support[ed] . . . [the court's] independent analysis of the unambiguous mandate of section 10-3-1117(2)(a)." *Id.*

    [5] Shelter argues that requiring disclosure here "renders the phrase 'is or may be relevant' redundant and superfluous" by "requir[ing] disclosure of every policy issued to the insured." Shelter's Open. Br. at 26–27. But section 10-3-1117(2)(a) doesn't require insurers to disclose "every policy issued to the insured." *Id.* It requires them to disclose information about "each known policy

*(footnote continued)*

16

On top of that, the *Bohanan* policy was less relevant than the policies here. In *Bohanan*, the policy wasn't purchased until after the collision. *Id.* at *1. Yet here, the non-Ranger policies were active during the collision and simply listed different vehicles. Collisions can be covered under policies other than a vehicle's primary policy. *See, e.g.*, Colo. Rev. Stat. § 10-3-1117(2)(a) (requiring insurers to disclose information about "excess or umbrella insurance"). Given that, we need not "imagine the outer parameters of the statute" and can instead observe that if the *Bohanan* policy met section 10-3-1117(2)(a)'s definition of "is or may be relevant," the non-Ranger policies do, too.[6]

Finally, *Bohanan* relied on the federal district court's reading of section 10-3-1117(2)(a). The *Bohanan* court recounted *this* case's facts; explained that in both cases, "the question of coverage . . . was not immediately clear"; and held, like the district court did here, that section 10-3-1117 required disclosure. 2026 WL 304180, at *4–5. And though Shelter notes that *Bohanan* wasn't unanimous and urges us to adopt the dissent's reasoning instead, even the

---

of insurance of the named insured . . . that is or may be relevant to the claim." Colo. Rev. Stat. § 10-3-1117(2)(a). The statute's meaning hasn't changed just because in this case, "each known policy . . . that is or may be relevant to the claim" led to the same result as "every policy."

[6] For the same reason, we need not address Shelter's citations to other states' disclosure laws. With *Bohanan* to guide us, we think it sufficiently clear that section 10-3-1117(2)(a) required Shelter to produce copies of the non-Ranger policies to Fogel.

17

dissent credited the district court's decision. *See id.* at *10. Put differently, the district court's application of section 10-3-1117(2)(a) earned the support of the entire *Bohanan* panel, despite the panelists' differing interpretations of the statute. That hardly suggests that the district court's application was wrong.

In sum, as in *Bohanan*, we conclude that section 10-3-1117(2)(a) "unambiguously required [Shelter] to provide [Fogel] with a copy of the polic[ies]" he requested.[7] *Bohanan*, 2026 WL 304180, at *5. We affirm summary judgment for Fogel on liability.

## III.    Penalty — Section 10-3-1117(3)

The parties dispute how much money Shelter owes for failing to produce copies of the non-Ranger policies. Fogel argues that section 10-3-1117(3) authorizes one penalty for *each* unanswered request.[8] But Shelter argues that the statute authorizes one penalty for *all* unanswered requests related to a single claim. Shelter also argues that any penalties stopped accruing on July 22, 2022, when it wrote to Fogel explaining why the non-Ranger policies didn't

---

[7] Because the statute applies unambiguously to this case's facts, we need not resort to extratextual considerations like section 10-3-1117's purpose or the rule of lenity. *See Klinger v. Adams Cnty. Sch. Dist. No. 50*, 130 P.3d 1027, 1031 (Colo. 2006); *People v. Jones*, 464 P.3d 735, 748 (Colo. 2020). Thus, we also need not consider Fogel's contention that Shelter didn't preserve its rule-of-lenity argument.

[8] We call this a "penalty" because section 10-3-1117(3) uses that word. We express no opinion about whether the statute is penal, as Shelter's rule-of-lenity argument contends. *See generally Weatherill v. State Farm Mut. Auto. Ins.*, --- P.3d ----, 2026 WL 693004, at *3–7 (Colo. App. Mar. 12, 2026) (holding that for statute-of-limitations purposes, section 10-3-1117 isn't penal).

apply. In Shelter's view, that letter complied—or at least substantially complied—with Shelter's obligations under the statute.

The district court was right on both counts. It correctly held that section 10-3-1117(3) authorizes one penalty per claim, not one penalty per request. And it correctly held that Shelter's July 2022 letter neither complied nor substantially complied with its duties under the statute. So we affirm the court's partial grant of summary judgment to Fogel for a $35,600 penalty award—$100 per day for the 356 days from March 4, 2022 (thirty-one days after Fogel's policy requests), to February 23, 2023 (when Shelter produced copies of the non-Ranger policies under Rule 26(a)(1)).

## A.    Single Penalty, Not Multiple

As always, we start with the statute's text. *Sentinel*, 577 P.3d at 53. Recall the first two sentences of section 10-3-1117(3):

> An insurer that violates this section is liable to the requesting claimant for damages in an amount of one hundred dollars per day, beginning on and including the thirty-first day following the receipt of the claimant's written request. The penalty accrues until the insurer provides the information required by this section.

Immediately, we observe that the statute says nothing about multiple penalties. Instead, it refers to "*[t]he* penalty" of "one hundred dollars per day" when "[a]n insurer . . . violates" the statute. Colo. Rev. Stat. § 10-3-1117(3) (emphasis added). Had the Colorado legislature intended to authorize multiple penalties, it could easily have said so. *See Stumpf v. Colo. Dep't of Rev., Motor Vehicle Div.*, 231 P.3d 1, 3 (Colo. App. 2009) (explaining that the legislature

19

"does not . . . hide elephants in mouseholes" (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)). That's a good indicator that the statute authorizes just one penalty, not multiple.

But what clinches this point isn't the text of section 10-3-1117(3). It's the text of section 10-3-1117(2)(a), the liability provision. Recall what that provision requires insurers to do:

> Each insurer . . . shall provide to the claimant . . . a statement setting forth the following information *with regard to each known policy of insurance of the named insured*, including excess or umbrella insurance, that is or may be relevant to the claim.

Colo. Rev. Stat. § 10-3-1117(2)(a) (emphasis added).

That language contemplates that for a single claim, there can be multiple policies that "[are] or may be relevant." *Id.* And critically, upon "a written request from the claimant or the claimant's attorney," an insurer must disclose information about *all* those policies, not just the ones the claimant requests. *Id.* In other words, no matter how many policies the claimant specifies—or whether he specifies any at all[9]—the insurer's obligation is the same: to disclose information about "*each* known policy of insurance . . . that is or may be relevant to the claim." *Id.* (emphasis added).

Because section 10-3-1117(2)(a) neither requires nor expects a claimant to request policy information multiple times, we don't interpret section 10-3-

---

[9] Nothing in the statute requires claimants to request specific policies. Again, the text refers only to "a written request from the claimant or the claimant's attorney." Colo. Rev. Stat. § 10-3-1117(2)(a).

1117(3) as penalizing an insurer based on how many times the claimant requests information. That's not consistent with the statute's requirement that upon a claimant's request, an insurer disclose information about "each known policy . . . that is or may be relevant." *Id.*

Nor is that reading consistent with our duty to avoid interpreting statutes in a way "that would lead to illogical or absurd results." *B.C.B.*, 569 P.3d at 79. Under Fogel's preferred interpretation, claimants could file unnecessary requests simply to run up the penalty. Such a scheme would serve no legitimate disclosure goal. And it would "produce a result contrary to the expressed intent of the legislature," *Smith v. Exec. Custom Homes*, 230 P.3d 1186, 1191 (Colo. 2010)—namely, a situation that discourages insurers from offering coverage, because no insurer wants to incur massive fines for not responding to scores of pointless requests. *See* Colo. Rev. Stat. § 10-1-101 (declaring that one purpose of Colorado's insurance statutes is "to give consumers . . . the greatest choice of policies at the most reasonable cost possible"); *cf. Frazier v. People*, 90 P.3d 807, 812 (Colo. 2004) (declining to read a statute as decreasing penalties when its purpose was to increase them).

In sum, we reject Fogel's view of section 10-3-1117(3) and affirm the district court's interpretation that the statute authorizes just one penalty per claim, not one penalty per request.[10]

**B.    Compliance**

For "each known policy . . . that is or may be relevant to the claim," an insurer must disclose four things: (1) the insurer's name; (2) each insured's name, as it appears on the policy's declarations page; (3) the policy's liability limits; and (4) "[a] copy of the policy." Colo. Rev. Stat. § 10-3-1117(2)(a).

Shelter's July 2022 letter didn't meet those requirements. Though the letter includes Shelter's name and the non-Ranger policies' liability limits, it lacks other required information. For example, rather than producing a copy of each policy, the letter merely excerpts "the same policy form" that those policies relied on. App. vol. II at 457.

Recognizing that the letter didn't produce "separate copies" of the non-Ranger policies, Shelter argues that Fogel didn't need copies. Shelter's Open.

---

[10] Because the statute unambiguously authorizes just one penalty per claim, we again need not resort to extratextual considerations like section 10-3-1117(3)'s purpose. *Klinger v. Adams Cnty. Sch. Dist. No. 50*, 130 P.3d 1027, 1031 (Colo. 2006). We also need not wade into the parties' dispute about whether and when Shelter received Fogel's Lacrosse and Transit requests from Shelter's registered agent, the Colorado Division of Insurance. It is undisputed that on February 1, 2022, Shelter received Fogel's request for at least one of the non-Ranger policies, the PT Cruiser policy. So even Shelter agrees that any nondisclosure penalty began accruing on March 4, thirty-one days later. And because the penalty accrues on a per-claim basis, Shelter owes the same penalty even if it *never* received the Lacrosse and Transit requests.

Br. at 48. In fact, it says, the statute "does not require any particular form of disclosure" beyond "some statement that provides the specified information"—a standard Shelter insists it met. *Id.* at 45.

That argument ignores the statute's text. Shelter asks us to read the words "copy of the policy" to mean *excerpts* from a *different* policy—and even then, to do so on Shelter's assurance that the policies were relevantly identical. But a "copy" is a "duplicate." *E.g.*, *Copy*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003); *see also Copy*, Black's Law Dictionary (11th ed. 2019) ("[a]n imitation or reproduction of an original"). And a "duplicate" is "either of two things *exactly alike*." *E.g.*, *Duplicate*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003) (emphasis added). So an excerpt can never be "[a] copy of the policy," much less when the excerpt comes from a different policy altogether.[11]

Anticipating this problem, Shelter says we should read section 10-3-1117 to demand only substantial compliance, not strict compliance. On that reading, Shelter argues, its July 2022 letter "was more than sufficient to satisfy even the

---

[11] This reading is supported by a state regulation in effect at the time of Fogel's requests. Under section 10-3-1117, the regulation required insurers to "provide a copy of the commercial or personal automobile policy, which does not include the declarations page or the application even if attached to the policy." Colo. Code Regs. § 702-5-5-2-03, § 5(C) (2020). If "copy" didn't mean "duplicate," it wouldn't make sense for the regulation to specify that insurers must omit the declarations page and application. The regulation also shows that a declarations page doesn't substitute for a "copy" of a policy, despite Shelter's argument that with the declarations pages here, Fogel could have "readily verif[ied] that the policy forms . . . comprising the four policies were identical." Shelter's Reply & Resp. Br. at 17 n.4. The regulation was repealed in December 2025. *See* 48-19 Colo. Reg. 637, 637–40 (Oct. 10, 2025).

23

broadest interpretation of the purposes of the disclosure statute." Shelter's Open. Br. at 48.

Shelter is correct that some statutes leave "no margin for error" while others demand less than "absolute" conformity. *Colorow Health Care v. Fischer*, 420 P.3d 259, 262 (Colo. 2018) (citation omitted). But we need not decide which kind of statute section 10-3-1117 is. Even if the statute expects only substantial compliance, Shelter's July 2022 letter fell short.

To decide whether a party substantially complied with legal requirements, Colorado courts consider, among other factors, (1) "the extent of the party's noncompliance," (2) "the purpose of the provision violated and whether that purpose is substantially achieved despite the party's noncompliance," and (3) "whether it can reasonably be inferred that the party made a good faith effort to comply or whether the party's noncompliance is more properly viewed as the product of an intent to mislead." *Id.* at 266 (citation modified).

None of the factors favors Shelter. First, Shelter's noncompliance was stark. Section 10-3-1117(2)(a) required Shelter to produce a "copy" of each of the non-Ranger policies. Colo. Rev. Stat. § 10-3-1117(2)(a)(iv). But in its July 2022 letter, Shelter merely excerpted the Ranger policy. The difference between that response and the response the statute required wasn't one of degree—it was one of kind. *See Colorow*, 420 P.3d at 262 (distinguishing between "obligations" and "conform[ity]" with obligations).

24

Second, Shelter's noncompliance undermined the statute's purposes. The purposes of section 10-3-1117 include "transparency in the insurance claims process to further the public policy of encouraging settlement and preventing unnecessary litigation." Colo. Rev. Stat. § 10-3-1101(2). Colorado's legislature wanted claimants to "fully understand the total amount of insurance coverage available to them" and to "have accurate and reliable information" about that coverage. *Id.* Yet rather than providing the information as the statute required, Shelter sent it in dribs and drabs, all while assuring Fogel that he didn't need anything else. That take-our-word-for-it approach isn't transparency.

Third, Shelter's noncompliance doesn't point to a good-faith effort. The statute is clear about what compliance requires. So we can understand why, at the penalty hearing, the district court was confused about Shelter's actions:

> [W]hy not provide [copies of the policies]? . . . I don't think I saw any kind of burden argument in your papers. I mean, pretty straightforward to just provide a copy, rather than force [Fogel] to take your word for [it], which by the way, aligns with the spirit of the statute, right? . . . And if it doesn't take a whole lot more to simply provide copies of the policies than to just provide key information and say, "And they're the same. Take my word for it," why not provide them?

App. vol. III at 649. We need not decide whether Shelter's noncompliance "is more properly viewed as the product of an intent to mislead." *Colorow*, 420 P.3d at 266 (citation omitted). Like the district court, we're puzzled why Shelter didn't just do what the statute plainly commands. And that's enough for

25

us to conclude that it cannot "reasonably be inferred that [Shelter] made a good faith effort to comply." *Id.* (citation omitted).

Thus, we reject Shelter's arguments and hold that its July 2022 letter neither complied nor substantially complied with section 10-3-1117(2)(a). Under the penalty-per-claim interpretation of section 10-3-1117(3) discussed above, we affirm the district court's partial grant of summary judgment to Fogel for a $35,600 penalty award—$100 per day for the 356 days from March 4, 2022 (thirty-one days after Fogel's policy requests), to February 23, 2023 (when Shelter produced copies of the non-Ranger policies under Rule 26(a)(1)).

## IV.    Fees — Section 10-3-1117(3)

Finally, Fogel asks us to award him appellate attorneys' fees and costs. Shelter opposes, but only because it says it didn't violate section 10-3-1117(2)(a).

We agree with Fogel. When a fee award is "part and parcel of the cause of action over which [a federal court] [has] diversity jurisdiction," state law governs. *Banner Bank v. Smith*, 30 F.4th 1232, 1239 (10th Cir. 2022) (citation omitted). Section 10-3-1117(3) requires an insurer to pay "fees and costs incurred by a claimant in enforcing the penalty." And under Colorado law, "[a] statutory award of attorney[s'] fees may include reasonable appellate attorney[s'] fees." *Town of Erie v. Town of Frederick*, 251 P.3d 500, 506 (Colo. App. 2010). That includes fees "for successfully defending the appeal."

26

*Melssen v. Auto-Owners Ins.*, 285 P.3d 328, 339 (Colo. App. 2012) (citation omitted) (awarding appellate fees under section 10-3-1116(1)).

Because Fogel successfully defended the penalty against Shelter's appeal, we deem him entitled to appellate fees and costs for that effort. As Fogel concedes, this award does not include fees and costs for his unsuccessful cross-appeal about multiple penalties. *See id.*; *Stuart v. N. Shore Water & Sanitation Dist.*, 211 P.3d 59, 64 (Colo. App. 2009). We leave the calculation of his appellate fees and costs for the district court on remand.[12]

## CONCLUSION

We affirm the district court's judgments, deem Fogel entitled to fees and costs for defending Shelter's appeal, and remand for further proceedings.


Entered for the Court


Gregory A. Phillips
Circuit Judge

---

[12] Again, pending this appeal, the district court deferred determination of Fogel's attorneys' fees and costs.